[No. 27909. Department One. September 14, 1940.]

O.ʹM. Pitzen, *as Administrator, Respondent,* v. Robert S. Doubleday, *Defendant,* Central Bank, *Appellant.*[1]

*Wayne W. Keyes* and *Weter, Roberts & Shefelman,* for appellant.

*S. A. Gagliardi,* for respondent.

[1]Reported in 105 P. (2d) 726.

SIMPSON, J.—This action was instituted to collect funds belonging to an estate, which had been deposited in a savings account in the defendant bank by Robert S. Doubleday, and which were thereafter appropriated to his own use. The action was tried to the court, resulting in a judgment against the defendants. The bank has appealed.

We summarize the facts as follows: Dominick McFadden and Bridget E. McFadden, husband and wife, were residents of, and owned property in, Pierce county. May 11, 1935, Bridget E. McFadden died, and on the fourteenth day of that month, Robert S. Doubleday was appointed and qualified as the administrator of her estate. July 24, 1935, he filed an inventory of her estate, which showed that the estate owned a small tract of land and money deposited in the National Bank of Tacoma and in the United Mutual Savings Bank. The total value of the estate was shown to be $1,384.04.

Dominick McFadden died September 18, 1935, and Doubleday was appointed administrator of his estate. The inventory of that estate disclosed assets of the value of $2,364.12.

The estates were consolidated and eventually closed. Thereafter, the estate proceedings were reopened, and respondent O. M. Pitzen was appointed administrator *de bonis non* of the consolidated estates and brought this action to recover from the defendants.

During her lifetime, Bridget E. McFadden kept U. S. Government bonds registered in her name of the face value of eight thousand dollars in a safe deposit box in the Bank of California. During the month of July, 1935, Doubleday opened the safe deposit box and took therefrom the government bonds. No inventory was made of these bonds in either the estate of Bridget E. McFadden or Dominick McFadden. On or about August 1, 1935, Doubleday consulted the cashier of the

appellant bank relative to securing the money then due upon the bonds, claiming that they had been given to him by Mrs. McFadden. Doubleday's testimony, in which he was corroborated by the cashier, was as follows:

"I explained to him the gift of these bonds to me, a rather unconventional way of conveying them, and I asked him if he would not permit them to be cashed without raising any question."

The cashier agreed to send the bonds to Washington for the purpose of securing the money due thereon. November 7, 1935, Doubleday presented to the cashier of appellant bank the bonds, three of one thousand dollars each and one of five thousand dollars. The bank took the bonds and forwarded them to the Treasurer of the United States for payment. The United States Treasurer then demanded documentary evidence of the ownership of the bonds and the death of the payee Mrs. McFadden. The cashier or clerk of appellant prepared, upon a blank provided by the government to identify Mrs. McFadden as the person whose name was registered as owner of the bonds, certain affidavits, these affidavits being signed by Doubleday and another individual. They were sworn to before the bank cashier, who was a notary public. The affidavits disclosed that Mrs. McFadden was deceased, that the bonds were found among the effects of the decedent, that Doubleday was the administrator of her estate, and that the bonds actually were the property of the estate represented by Doubleday. In a letter addressed to the United States Treasury, signed by the bank cashier, it was stated:

"You will also find enclosed a copy of the Letters of Administration No. 28932 authorizing Robert S. Doubleday, administrator of the Estate of Bridget E. McFadden."

The Treasurer of the United States thereafter issued and sent to the bank a check payable

"To the Order of Estate of Mrs. Bridget McFadden, Deceased, by Robert S. Doubleday, Administrator."

The check was in the sum of $8,170, which covered the amount due upon the bonds and accrued interest in the sum of $170. The check was sent to the bank, and by one of its officers delivered to Doubleday, who endorsed it "Estate of Mrs. Bridget McFadden, Deceased, by Robert S. Doubleday, Administrator." The amount of the check, less collection charges of $25, was then placed to the credit of Doubleday's personal savings account in appellant bank.

Prior to the times we have mentioned, Doubleday had two checking accounts in the bank; one known as the Motor Line, the other as the Glacier Mining Company account. After the money had been deposited in the savings account, Doubleday proceeded to transfer it in varying amounts to those two checking accounts, and from them he paid many of his own bills, debts, and accounts. The payments included one thousand dollars to the appellant bank, this amount representing money to be paid by the bank to the vendor of some real property, pursuant to a contract under which two of the bank officials were named as vendees. Doubleday made this payment through the bank as part of a transaction whereby he was made the assignee of the bank officials' interest in the land. This money was paid by the bank to the vendor.

April 20, 1936, Doubleday executed his note to the bank in the sum of $650, which he paid April 28, 1936. The evidence does not disclose from what source Doubleday secured the money to pay this note. July 1, 1936, the Glacier Mining Company account was overdrawn in the sum of twenty dollars, and money was taken from the savings account to make good this

overdraft. September 3, 1936, he borrowed one hundred fifty dollars from the bank which was thereafter repaid from the Motor Line account. On the same day, it was found that the Motor Line account did not have sufficient funds to repay the loan, and $220 was transferred from Doubleday's savings account for the purpose of making good the charges. July 2, 1937, Doubleday executed a note to the bank for the sum of one hundred dollars. August 31, 1937, the bank paid this note by withdrawing fifty dollars each from the Motor Line account and from the savings account.

There was abundant evidence produced at the trial to prove that Doubleday appropriated the money received from the bonds and used it for his own account. It is equally clear that the bank officials knew these facts.

Appellant contends that it acted in good faith in allowing Doubleday to deposit the money in the savings fund and to then withdraw it for his own purposes, for the reason that its officials believed Doubleday when he told them that Mrs. McFadden had made him a present of the bonds. It further maintains that, in any event, it is not liable for the misdeeds of Doubleday, even though its officers knew he was using the funds of the estate.

There is much to be said in favor of appellant's first contention. Doubleday had a good reputation, was a customer of the bank, and nothing had occurred which had caused the bank officials to have the least suspicion regarding his good faith.

In urging that, in any event, it is not responsible, appellant calls our attention to Rem. Rev. Stat., § 3410-1 [P. C. § 295a], and to our holding in *Moody v. Clarke County Bank of Washougal*, 181 Wash. 263, 42 P. (2d) 803.

We are unable to see the application of the statute.

Appellant's officers knew that Doubleday received the check and endorsed it as the administrator of the Bridget E. McFadden Estate, and that he thereafter used the money for his own purposes. They had actual knowledge of the misappropriations.

The *Moody* case, *supra,* is in point and determines the disposition of this case. In that case, it appeared that O. Hiim was cashier of the defendant bank and guardian of an estate which had funds deposited in the bank. He withdrew one thousand dollars from the guardianship account and placed it in his private checking account. Later, other funds were in like manner withdrawn from the account of the estate and deposited to the credit of a corporation of which Hiim was an officer. Hiim used the withdrawn funds for his own purposes. In passing upon the question presented relative to the liability of the bank, this court stated:

"The rule established by the great weight of authority is to the effect that a bank which permits a trustee to transfer known trust funds to his own private account does not itself become liable merely because it permits such a transfer. [Citing cases.]

"In order that a bank may be held liable, it must appear that, in addition to merely permitting such transfer, it, the bank, actually participated in some manner in the misappropriation. . . .

"No case has been cited, and we have found none, which holds that anything less than a receipt of the funds by the bank in payment of the personal debt of the trustee is participation. But, even though participation may be something less than the actual obtaining of the funds from the wrongdoer, still we find nothing of that nature here."

We are unable to measure any difference between the facts in the *Moody* case and those presented here. In each, a bank representative knew of the misappropriation and the loss occasioned to the estate. We are

not disposed to depart from the rule announced in that case.

Respondent insists, however, that the one thousand dollars paid for the property belonging to the bank officers should be charged to the bank. Again, it must be stated that that transaction involved the officers in their personal affairs, and not as representatives of the bank.

Respondent cites *Harden v. State Bank of Goldendale*, 118 Wash. 234, 203 Pac. 16, as authority for holding appellant responsible. The case does not aid respondent, however, for the reason that the bank in that case took the property of the estate as collateral security for the payment of the administrator's note made to the bank. In that case, the bank made a profit, or at least secured a benefit, as the result of a wrong which it knew the administrator was perpetrating. The facts in that case are entirely unlike those in the case at bar.

The appellant bank did not profit from any of the misappropriations, except in the payments of the loans which Doubleday secured from it and the payment of twenty dollars overdraft on the Glacier Mining Company account.

Under the rule announced in the *Moody* case, *supra,* and the authorities cited therein, the bank was responsible for these amounts, which total two hundred seventy dollars.

The judgment is reversed, with instructions to the trial court to enter judgment against appellant bank in the sum of two hundred seventy dollars, together with interest thereon at the legal rate from the dates the sums were paid to appellant.

BLAKE, C. J., MILLARD, and ROBINSON, JJ., concur.

BEALS, J. (dissenting in part)—I concur in the fore-going opinion, save in so far as it is held that appellant is not liable for the one thousand dollars paid to the bank in connection with its real estate transaction.