[No. 32121. Department Two. April 15, 1953.]

GENERAL CASUALTY COMPANY OF AMERICA, *Appellant* v.
SEATTLE-FIRST NATIONAL BANK, *Respondent.*

AMERICAN SURETY COMPANY OF NEW YORK, *Appellant*, v.
SEATTLE-FIRST NATIONAL BANK, *Respondent.*[1]

[1]Reported in 256 P. (2d) 287.

*Donald E. Spickard, Morris H. Russell,* and *Lewis L. Stedman* (of *Stedman & Stedman*), for appellants.

*Howe, Davis & Riese* (*Wallace Aiken,* of counsel), for respondent.

HAMLEY, J.—Two successive compensated sureties brought these actions to recoup losses sustained by them when they were required to make good the embezzlement of $10,266.35 of the funds of the territory of Alaska (Alaska). The actions were consolidated for the purpose of trial and appeal.

The embezzlements in question were accomplished by Oscar G. Olson, former treasurer of Alaska. The funds were

embezzled from public moneys which Alaska had on deposit with Seattle-First National Bank, a Washington banking corporation, named defendant in these suits. Olson also embezzled $34,494.66 of territorial funds on deposit with the B. M. Behrends bank of Juneau, Alaska. He is now incarcerated in McNeil Island Federal penitentiary.

The plaintiff surety companies are American Surety Company of New York (American) and General Casualty Company of America (General). American reimbursed Alaska for the $9,136.81 which Olson embezzled between April 1, 1939, and April 1, 1947. General, which was surety on Olson's bond after April 1, 1947, reimbursed Alaska for the $1,120.54 embezzled between that date and May 7, 1949. By virtue of these payments, American and General stand in the position of assignee and subrogee of Alaska, respectively, in bringing these actions against the bank.

There is no substantial dispute as to the facts. Defendant was already a designated depository of territorial funds when Olson became treasurer of Alaska in 1935. He continued the territorial account, but sent in a new signature card authorizing the bank to honor checks signed: "Oscar G. Olson—Territorial Treasurer." From 1935 until his resignation in 1949, Olson kept a substantial amount of territorial funds on deposit in this account.

The method by which Olson accomplished his embezzlements was to draw checks upon the territorial account, which checks were not in payment of warrants drawn by the auditor of Alaska or for any bona fide territorial purpose. Thirty such checks were drawn and honored between April 11, 1940, and March 11, 1949.

The first of these embezzlements occurred on April 11, 1940, when Olson went to the bank and signed and cashed a counter check in the sum of $416.68. An officer of the bank prepared at least a part of this counter check and initialed it to enable Olson to receive cash from the teller. Olson told this bank officer that the check was in payment of Olson's salary. Olson's salary was, in fact, $416.68 a month, but he had already received his salary for April, 1940.

Nine days later, on April 20, 1940, this procedure was repeated, except that a customers' draft was used rather than a counter check, and the amount of the draft was $416.66. These were the only embezzlements in 1940. The embezzlements after 1940, were spaced as follows: One in 1941, seven in 1942, two in 1943, six in 1944, one in 1945, three in 1946, six in 1947, and one each in 1948 and 1949.

Twenty-two embezzlement checks made use of the same printed bank forms which were normally used on all legitimate transactions. Counter checks, some of which were prepared in part by bank officials, were used in six instances. A customers' draft form was used once, and on one occasion a memorandum of debit, in response to Olson's telegraphic request from Nampa, Idaho, was used.

Seven of these checks were made payable to New York Life Insurance Company, six were made payable to the collector of internal revenue, and one each was made payable to six miscellaneous payees, such as Riggs Optical Company and the Olympic Hotel in Seattle, and Lindsey & Sons, an automobile dealer in Nampa, Idaho. Olson gave all of these checks in payment of his personal obligations.

In addition, Olson drew and the bank honored four checks made payable to the bank, two made payable to Olson, two made payable to Mrs. Olson, two made payable to cash, and the memorandum of debit previously mentioned. Olson obtained cash on all of these transactions and used the cash for his own purposes.

Olson did not maintain a personal account in defendant bank and did not pay any of the embezzled funds to the bank for any purpose whatsoever. All of the embezzlement checks were signed in the manner required by the signature card. Aside from the authorized style of signature, the bank was under no instruction from Olson or any other officer of Alaska relative to the treasurer's authority to make withdrawals. The trust agreement, whereby collateral security was posted by the bank pursuant to territorial law (Alaska Comp. Laws, Anno., 1949, § 7-1-6 (a)), obligated the bank to "safely keep and pay on demand to the Trea-

surer as required by him," all territorial funds on deposit at the bank.

The bank officials did not know that the embezzlement checks were not supported by auditor's warrants, or that they were being given in payment of Olson's personal obligations, or that cash which he obtained on some of them was being used for his personal purposes, unless such knowledge can be inferred from the facts heretofore stated.

After a trial to the court, findings of fact were entered, from which the court concluded that the suit of American was barred by the statute of limitations, and that, apart from this defense, neither plaintiff was entitled to recover on the merits. The court's conclusion of law with reference to the merits reads as follows:

"Aside from the bar of the Statute of Limitations, neither plaintiff is entitled to recover on the merits of the case. The defendant Bank acted in good faith without notice or knowledge of any lack of authority on the part of Mr. Olson. The Bank was under a duty to honor the checks and disburse moneys upon the demand of the Treasurer and it complied with the demands. The Bank was under no duty to ascertain whether a warrant had been drawn on the Treasurer. The Bank was not negligent in handling the account. Plaintiffs are barred and estopped by virtue of their long acquiescence and consent to the method and manner in which the Treasurer drew checks on defendant Bank and by virtue of their failure to audit or cause an audit to be made and by virtue of their failure to examine the monthly statements and cancelled checks. The Bank did not commit any fraud and did not conceal any facts or misrepresent any facts. The Bank did not participate in the misappropriations and at all times acted in good faith. The Bank did not have actual knowledge that the checks were drawn without the authority of the Territory of Alaska, and therefore Rem. Rev. Stat., 3410-1 is applicable."

Judgment was entered accordingly, and plaintiffs appeal. The thirty-three assignments of error, taken together, challenge the trial court's failure to accept appellants' theory of the case.

■ Appellants' theory is predicated upon the general common-law rule that a bank which permits a trustee to

withdraw trust funds with notice that the trustee is misapplying or intends to misapply them becomes liable as a participant in the breach of trust. 3 Scott on Trusts (1939 ed.) 1742, § 324.3; 2 Restatement of Trusts 964 § 324. Applying this rule, it is appellants' contention that respondent bank is chargeable with knowledge that Olson was misapplying these funds because, under the circumstances, it had notice of certain territorial statutes limiting Olson's authority, and that, in making such withdrawals, Olson exceeded his statutory authority.

With reference to the asserted statutory limitations upon the treasurer's authority, appellants first call attention to subsection (b) of § 7-1-6, *supra*, which reads as follows:

"He [the treasurer] shall disburse public moneys only upon warrants drawn upon the Treasurer by the Auditor *or as otherwise provided by law*, not inconsistent with this Act." (Italics ours.)

As before indicated, the embezzlement checks were not supported by warrants.

Several cases are cited by appellants wherein a bank which permitted withdrawals by a trustee from trust funds, in direct violation of a statute or a court order, was charged with notice and found liable. *New Amsterdam Cas. Co. v. First Nat. Bank of Gilmer,* 134 S. W. (2d) (Tex. Civ. App.) 470; *Fidelity & Cas. Co. v. Farmers Nat. Bank,* 275 N. Y. 194, 9 N. E. (2d) 833; *Fidelity & Deposit Co. v. Queens County Trust Co.,* 226 N. Y. 225, 123 N. E. 370; *Employers' Liability Assur. Corp. v. Hudson River Trust Co.,* 250 App. Div. 159, 294 N. Y. S. 698, affirmed in 276 N. Y. 542, 12 N. E. (2d) 567.

In the instant case, however, we do not believe that the quoted provision gives notice that warrants were required in each and every case. The words which have been italicized suggest, in fact, that disbursements unsupported by warrants might be permissible under other territorial statutes. It may well be that there are no other statutory provisions under which disbursements could be made without supporting warrants. That fact, however, cannot be ascertained by examining subsection (b), but would require a

study of all existing legislation and of each new enactment as it becomes law.

The evidence shows, moreover, that the treasurer did, on numerous occasions, draw and issue checks, unsupported by warrants, for bona fide territorial purposes. Such checks, for example, were sometimes issued in anticipation of warrants thereafter issued. Other checks, unsupported by warrants, were issued to effect refunds on fish trap licenses, pay bounties, transfer funds from one depositary to another, and, until January 1, 1946, to pay commissions to tax collectors and refund overpayments of taxes.

Since this statute is subject to the construction that warrants are not required in all cases, and since it has been so administratively construed over a long period of time in connection with bona fide transactions, we do not believe that it affords a proper basis for liability in this case. An additional reason for reaching the same conclusion is that the statute provides no practicable method whereby a bank, when presented with a treasurer's check, could determine whether or not a supporting warrant had been issued. In this connection, see *New Amsterdam Cas. Co. v. Robertson*, 129 Ore. 663, 278 Pac. 963, 64 A. L. R. 1396.

Having reached this conclusion, it is unnecessary to consider respondent's contention that it did not have actual knowledge of this foreign statute, and is not chargeable with constructive knowledge thereof.

The second statutory limitation relied upon by appellants is the requirement that territorial funds are to be disbursed only for authorized public purposes. This requirement is to be inferred from the act read as a whole, and finds particular expression in subsection (d) of § 7-1-6, *supra*. It is there provided that territorial funds are not to be disbursed "except in pursuance of laws authorizing the payment thereof."

Assuming that the bank is chargeable with knowledge of this general statutory limitation upon the treasurer's authority, did it have notice that Olson was violating the statute

by making withdrawals for other than authorized public purposes?

It is not contended that the bank received any express notice or information to this effect from Olson or any other source. But appellants maintain that, because of the nature of the embezzlement transactions, the bank must have had notice that the funds were being withdrawn for unauthorized purposes.

As previously stated, Olson, with the knowledge of the bank, withdrew funds by the use of checks payable to himself and to third persons. He did not, however, deposit this money in a personal account at the bank, nor was any of it paid to the bank in discharge of a debt or for any other purpose whatsoever.

The general rule is that, when a trustee draws a check upon the trust account payable to himself or to a third person, in the absence of further circumstances known to the bank indicating that the trustee is committing a breach of trust, the bank is not liable for the breach of trust. 3 Scott on Trusts (1939 ed.) 1742, § 324.3; 5A Michie on Banking 183, § 64; 2 Restatement of Trusts 967, § 324, comment g. See annotations in 57 A. L. R. 925, 64 A. L. R. 1404, 106 A. L. R. 836, 115 A. L. R. 648; *Moody v. Clarke County Bank of Washougal,* 181 Wash. 263, 42 P. (2d) 803.

In the two Washington cases relied upon by appellant, *Rensselaer Valve Co. v. Union Nat. Bank,* 122 Wash. 494, 210 Pac. 947, 213 Pac. 490, and *Rensselaer Valve Co. v. National Bank of Commerce of Seattle,* 129 Wash. 253, 224 Pac. 673, the decisions were adverse to the defendant banks. But, as pointed out in *Moody v. Clarke County Bank of Washougal, supra,* both of these decisions rest upon the disregard and violation by the banks of explicit instructions relative to the agent's authority.

The case of *Employers' Liability Assur. Corp. v. Hudson River Trust Co., supra,* comes closest to supporting appellants' position. But there the funds withdrawn were deposited to the personal account of the trustee in the same bank before being disbursed for personal purposes. This is not the situation here. A conclusion contrary to the *Em-*

*ployers' Liability Assur. Corp.* case was reached in *New Amsterdam Cas. Co. v. Robertson,* 129 Ore. 663, 278 Pac. 963, 64 A. L. R. 1396, where the court said:

"In the instant case, the bank knew that the funds belonged to school district No. 106. The vital question is: Did it know that Robertson, the clerk, in transferring a portion of these funds to his personal account, intended to misappropriate them? Did this act, in and of itself, constitute notice to the bank of the wrongful diversion of public funds? True, the bank should have looked with suspicion upon such a transaction, but we are not prepared to say, as a matter of law, that it was obliged to make inquiry to ascertain whether the fiduciary was violating his trust. To do so would greatly encumber and hinder banking institutions in the transaction of legitimate business, by overburdensome restrictions. In the absence of notice to the contrary, the bank had the right to assume that Robertson was faithful to his trust.

"The clerk had at least *prima facie* authority to draw on the account. The bank was bound to honor his checks, unless, as above stated, it knew of an improper diversion of the funds. It was not the business of the bank to administer the trust. The form of the checks and the manner in which the account was handled did not, according to the weight of authority, constitute notice of a misappropriation." (p. 669)

■ Appellants' contention as to notice seems untenable, in view of the general rule to which reference has been made. In addition, however, we have a statute in this state which is manifestly designed to relax some of the common-law rules under which banks were formerly held liable. This statute is RCW 62.01.0195 (Rem. Rev. Stat., § 3410-1), which reads as follows:

"Where a check or other negotiable instrument is drawn, made or indorsed in the name of or for a corporation, firm, association, estate or person hereinafter called principal by an officer, trustee, attorney or other agent or fiduciary, hereinafter called agent, to the personal order of such agent as payee or indorsee or to the order of a bank in which such agent keeps a personal account or to the order of any third person neither the fact that such check or other negotiable instrument is so drawn or indorsed, or is paid by the drawee, or is deposited in the personal account of such agent or is given by him or its proceeds used in payment of his private debt to the bank in which deposited or to any other person

or is negotiated by him in any personal transaction shall singly or collectively be sufficient to put the depositary or drawee bank or any other person, bank, firm or corporation upon inquiry as to the authority of such agent or constitute notice of an infirmity in the check or other negotiable instrument or defect in the title of the agent, in the absence of actual knowledge upon the part of such bank or person that such check or other negotiable instrument was drawn, indorsed, negotiated, deposited or paid without the authority of the principal."

This statute goes even farther than the uniform fiduciaries act, 9A Uniform Laws Annotated 19, § 5, in relaxing the common-law rule for the purpose of protecting banks from liability. RCW 62.01.0195, *supra*, excepts from its application only cases in which the bank has "actual knowledge" that the check was drawn, etc., without authority. The uniform act, however, also excepts cases in which there is knowledge of facts which indicate that the bank's action in taking the instrument "amounts to bad faith." See *Colby v. Riggs Nat. Bank,* 92 F. (2d) 183, 114 A. L. R. 1065, and annotations at 114 A. L. R. 1088.

Appellants assert, without the citation of supporting authority, that this statute does not apply to funds under the control of a public officer.

 The "principal" referred to in this statute is any "corporation, firm, association, estate or *person.*" (Italics ours.) In determining whether or not the term "person," as used in a statute, includes a state or other unit of government, the purpose and subject matter of the statute, and the context in which the term is used, may be considered, along with other factors. *United States v. Cooper Corp.*, 312 U. S. 600, 85 L. Ed. 1071, 61 S. C. 742.

 The evident purpose of this statute is strictly to limit the circumstances under which a bank may become liable for the unauthorized acts of agents in dealing with the funds of their principals. The statute is couched in all-inclusive terms. There is nowhere revealed an intent to exclude that important class of depositors consisting of units and agencies of government. We have not hesitated, on other occasions, to construe the word "person" as a generic term of such

comprehensive nature as to include the state. See *West Coast Mfg. & Ins. Co. v. West Coast Imp. Co.*, 25 Wash. 627, 66 Pac. 97; *Longview Co. v. Cowlitz County*, 1 Wn. (2d) 64, 95 P. (2d) 376. We are therefore of the opinion that this statute applies to a territorial depositor such as Alaska.

■ Applying the language of the quoted statute to the facts of this case, it will be seen that, in the absence of actual knowledge upon the part of the bank that any of these embezzlement checks were drawn, indorsed, negotiated, deposited or paid without the authority of Alaska, none of the following circumstances, singly or collectively, are to be deemed sufficient to put the bank upon inquiry as to Olson's authority, or as constituting notice to the bank of an infirmity in any such checks or of a defect in Olson's title thereto: (1) that some of the checks were drawn to the personal order of Olson as payee or indorsee; (2) that some of the checks were drawn to the order of third persons; (3) that all of the checks were paid by the drawee; (4) that some of the checks were given in payment of Olson's private debt to other persons; (5) that each of such checks was negotiated by Olson in a personal transaction.

All of the factors existing in the instant case which give rise to some suspicion that unauthorized withdrawals were being made are thus covered by one or more of the five kinds of transactions excluded from consideration under this statute.

It is true, of course, that, under this statute, the kinds of transactions noted above are to be disregarded only "in the absence of actual knowledge on the part of the bank" that such check was drawn, indorsed, negotiated, deposited or paid without the authority of the principal. Thus, in *Pitzen v. Doubleday*, 5 Wn. (2d) 370, 105 P. (2d) 726, where officers of the bank had actual knowledge that the administrator of an estate was using such funds for his own purposes, the statute was held inapplicable. In the case before us, however, there are no circumstances, other than those which are expressly excluded from consideration under the statute, from which actual knowledge can be inferred.

We are therefore compelled to conclude, both on the basis of the common-law rule and under the rule established by RCW 62.01.0195, that respondent bank is not chargeable with such knowledge of unauthorized withdrawals as will support appellants' cause of action.

Having reached this conclusion, we find it unnecessary to consider the following additional arguments advanced by respondent: (1) that even were it shown that the bank has actual knowledge of defalcations, it would not be liable because it did not participate therein, in the sense that it reaped monetary gains (see *Moody v. Clarke County Bank of Washougal, supra,* and *Pitzen v. Doubleday, supra*); (2) that both appellants are estopped by reason of Alaska's long acquiescence in the manner in which the funds were disbursed and its failure to order audits which would have revealed the misappropriations; and (3) that American's cause of action is defeated by the statute of limitations.

The judgment is affirmed.

GRADY, C. J., DONWORTH, and FINLEY, JJ., concur.

SCHWELLENBACH, J. (dissenting)—When a bank becomes the depositary of "public moneys" it owes a high degree of care to protect the public from defalcations of public officials. Such funds are "trust funds" in the truest sense of the term. I do not agree with the majority that RCW 62.01.0195 is couched in such all-inclusive terms, nor that the term "person" in the act includes a state or other unit of government.

---

June 1, 1953. Petition for rehearing denied.