[No. 19941.   Department One.   July 22, 1926.]

JOHN H. RICE, *et al., doing business as co-partners, under the name and style of Rice-Greisen Co., Respondents*, v. PEOPLES SAVINGS BANK, *Appellant*.[1]

[1] BANKS AND BANKING (20)—DEPOSITS—TITLE TO AND DISPOSITION —LIMITATION ON AUTHORITY OF AGENT—LIABILITY OF BANK. A bank is not liable for cashing a check of the plaintiff, endorsed in plaintiff's name by its agent and general manager, and deposited by the agent to his own personal account, where the agent had both actual and apparent authority to endorse plaintiff's checks in that manner and the bank had no notice of an undisclosed restriction upon the agent's powers whereby all of such checks should have been deposited by him in a bank to the plaintiff's credit.

Appeal from a judgment of the superior court for King county, Sessions, J., entered July 11, 1925, upon findings in favor of the plaintiffs, in an action for money received, tried to the court. Reversed.

*Kerr, McCord & Ivey*, for appellant.

*Stratton & Kane*, for respondents.

HOLCOMB, J.—Two causes of action were involved herein, one to recover the sum of $2,317.50, and the second for $52, as the proceeds of two checks.

The pleadings disclosed that respondents, a copartnership, with their principal place of business in San Francisco, California, maintained a branch office in Seattle, with one H. M. Watts as manager. Watts received the two checks which were payable to the firm, endorsed them in the name of the firm by himself as manager, and placed the proceeds in his personal account in the bank of appellant. The authority of Watts to endorse and deposit the checks is denied by respond-

¹Reported in 247 Pac. 1009.

ents and affirmed by appellant. Respondents also allege notice of lack of authority in Watts to endorse and deposit the checks as was done, which is denied by appellant. Of the proceeds of the first check of $2,317.50, $1,000 thereof was checked out by Watts and accounted for to respondents, so that the trial court in finding and concluding in favor of respondents, deducted that amount from the judgment.

At the trial below, it was shown by the evidence of respondents' own auditor, who seems to have been in charge of the branch offices of respondents, that he had sent instructions on behalf of respondents to Watts as manager of the branch office in Seattle, and his secretary, in which he instructed that, when checks were received in payment of subscriptions to stocks of companies which were being sold by Watts on behalf of respondents, the form of endorsement on such checks to be used by Watts was a general or blank endorsement, namely, "Rice-Greisen Company, by H. M. Watts, Manager." The evidence shows that the checks in question here were endorsed in exactly that manner. Upon opening the branch office in Seattle of which he was manager, Watts also, under instructions from his home office in San Francisco, opened an account in the name of respondents in the Union National Bank at Seattle, in which, according to the instructions sent him, the banking business of respondents was supposed to be transacted. Respondents, however, never had any direct communication with the Union National Bank until after the transaction involved here, and no letter of instructions was ever sent to it. When Watts, through his secretary, a woman named Beilgard, presented the checks in question to appellant, appellant's officers made inquiries and discovered that Watts was local manager and the sole person in charge of the

office of respondents in Seattle. They thereupon received the deposits and credited the same to the personal account of Watts. Some time in September, 1923, respondents discovered that Watts had not accounted for all the moneys received by him, but had deposited a part of the funds belonging to them to his personal account in the bank of appellant, and brought action to recover the amount that had not been accounted for. The personal account had been opened in the bank of appellant in May, 1923.

The questions to be determined, as formulated by appellant, are these: First, did Watts have actual or apparent authority to execute a general endorsement in the name of the company with respect to checks payable to the company? Second, assuming that he had such authority, real or apparent, did the bank incur a liability to the company by crediting the proceeds of such checks to the individual account of Watts? Or, in other words, was the form of the checks such notice to the bank as would charge it with the duty of refusing to credit the checks to the private account of Watts?.

On the other hand, respondents state the case to be: Where an agent, without the knowledge and without the authority of his principal, presents to a bank a check which is payable to his principal, endorses it in the name of the latter, and then in his individual name, and when the bank, without inquiry, cashes the check and deposits the proceeds in the individual account of the agent, is the bank charged with notice of the apparent lack of authority of the agent, and liable for converting the funds of the principal? Respondents thereupon proceed to argue from the premise that it has become well settled as law that a mere agent has no apparent authority to endorse a check of his principal and have the proceeds deposited to his individual

account, and that the bank depositing the proceeds of such a check to the agent's account is charged with notice of the apparent lack of authority of the agent, and is liable for conversion.

[1] The proposition of respondents, however, presumes, and necessarily so, that Watts, the agent and manager of respondents in Seattle, was without authority to endorse the name of his principal to checks. As shown by the reference to the evidence of the company's auditor, which was the only evidence offered on behalf of respondents on that question, Watts had authority to endorse checks in blank, or generally. It is true that the instructions given to him, and by which he was bound as between him and his principal, were to deposit the funds to the credit of respondents, his principals, in the bank in Seattle selected by him for the transaction of their business. But of that appellant had no knowledge. There is not a scintilla of evidence to the effect that any knowledge or notice of any kind of restriction or qualification as to the authority of Watts in endorsing the checks restrictively or qualifiedly, or as to directions for the deposit of the funds after endorsement, was ever given to appellant.

This is not such a case as those of *Rensselaer Valve Co. v. Union National Bank of Seattle,* 122 Wash. 494, 210 Pac 947, 213 Pac. 490, and *Renssalaer Valve Co. v. National Bank of Commerce of Seattle,* 129 Wash. 253, 224 Pac. 673, where the banks each permitted misappropriation of funds belonging to the principal after explicit notice of the extent and limits of the authority of the agent, in which we held that recovery could be had of funds so misappropriated after such notice (*Rensselaer Valve Co. v. Union National Bank of Seattle, supra*), but not of funds misappropriated before such notice.

The facts in this case give it similitude to our cases of *Mott Iron Works v. Metropolitan Bank*, 78 Wash. 294, 139 Pac. 36, and *Island Belt S. S. Co. v. Cafe*, 103 Wash. 263, 174 Pac. 19.

In the first case cited, the principal of the agent involved advised that the agent was authorized to make a restricted endorsement only on checks drawn payable to it, that is, the endorsement "For Deposit Only." The agent, however, did not follow the instructions, but pursued generally the course of endorsing the checks generally, naming the principal by himself as agent. The bank in that case, which was sought to be held liable for the agent's misappropriation, presented evidence that it knew of no such limitation upon the authority of the agent, and permitted him to make such diversion of the funds, which were brought to the bank for deposit as he pleased. Under such evidence, therefore, there was a question of fact for the jury. There was, also, as the court said, a question of fact for the jury as to whether or not the funds, derived from the particular check in question, had not been first credited to respondent's account, and afterwards diverted to the private account of the agent, contrary to the express instructions by respondent. In that case we took occasion to say:

"It is not a general rule of law that an agent having general authority to endorse checks belonging to his principal may not assign title of such check to himself. Nor is it a general rule of law in such a case that, when an agent does endorse a check with his principal's name and offers it for deposit to his private account in a bank, that the bank must inquire as to his authority to so deposit it before accepting the check on the pain of being liable to the principal for the proceeds of the check. An agent having general authority to endorse checks of his principal must of necessity have authority to direct the disposition of the proceeds of the checks.

His authority in this respect can of course be limited; but, in the absence of limitations known to the person receiving checks so endorsed, such person has the right to assume that the agent's powers with reference to the disposition of the proceeds of the check are unlimited. One of the purposes of the endorsement is to enable the check to be collected from the payee, and a bank acting as collector of a check endorsed in the payee's name by an authorized agent may, without liability to the principal, turn the proceeds of the check over to any person it is directed so to do by the agent, unless it has knowledge, actual or implied, that the agent's authority is confined to a particular disposition of the proceeds of the check. 'The principal which pervades all cases of agency, whether it be a general or a special agency, is this: The principal is bound by all acts of his agent within the scope of the authority which he holds him out to the world to possess, although he may have given him more limited private instructions, unknown to the person dealing with him. And this is founded upon the doctrine that, where one of two persons must suffer from the act of a third person, he who has held that person out as worthy of trust and confidence, and having authority in the matter, shall be bound by it. It will be at once perceived, this doctrine is equally applicable to all cases of agency, whether it be a case of general or of a special agent.' ''

Respondents intimate that the foregoing decision is not at all satisfactory for the purpose of settling the law in this state upon the question here involved, in view of the special features raised by the instructions and the singular issues developed by the pleadings. We do not consider that suggestion just. It is true there are very few authorities cited to sustain the argument above quoted in that case, but many authorities can be cited to the same effect. For example, in *Bischoff v. Yorkville Bank*, 218 N. Y. 106, 112 N. E. 759, a decision from a state having a rule much more favorable to respondents than many states, it was said:

"A fiduciary may legally deposit the trust funds in a bank to his individual account and credit. Knowledge on the part of the bank of the nature of the funds received and credited does not affect the character of the act. The bank has the right to presume that the fiduciary will apply the funds to their proper purposes under the trust. There are judicial decisions, in cases in which the fiduciary has converted the funds which hold the contrary. *United States Fidelity & Deposit Co. v. People's Bank*, 127 Tenn. 720, 157 S. W. 414; *Bank of Hickory v. McPherson*, 102 Miss. 852, 59 So. 934. The rule stated by us is, however, established in this and other jurisdictions, as the decisions hereinafter cited will disclose, and accords with reason. . . . Although the depositor is drawing checks which the bank may surmise or suspect are for his personal benefit, it is bound to presume, in the absence of adequate notice to the contrary, that they were properly and lawfully drawn. Adequate notice may come from circumstances which reasonably support the sole inference that a misappropriation is intended, as well as directly." (Citing cases.)

In another place the opinion cites and quotes from *Allen v. Puritan Trust Co.*, 211 Mass. 409, 97 N. E. 916, L. R. A. 1915C 518, as follows:

"The principal governing the defendant's liability is, that a banker who knows that a fund on deposit with him is a trust fund cannot appropriate that fund for his private benefit, or where charged with notice of the conversion, join in assisting others to appropriate it for their private benefit, without being liable to refund the money if the appropriation is a breach of the trust."

26 R. C. L. p. 1316, § 174, states the rule applicable as follows:

"The presumption is that a trustee will faithfully administer his trust and not misappropriate funds committed to his care, and so if moneys are deposited by one as trustee, he, as such trustee, has a right to withdraw them, and the bank, in the absence of notice

to the contrary, is bound to assume, and is protected in assuming, that the trustee will appropriate the moneys, when drawn, to the proper use; and this is true whether the checks are signed by him in his representative capacity or not. But if a bank in which moneys are deposited in the name of a trustee as such has knowledge that a breach of his trust is being committed by the improper withdrawal of such funds, or if it participates in the profits or fruits of any fraud on the trust, it is answerable. The mere fact, however, that a bank knows that moneys deposited with it have by a depositor been acquired in a fiduciary capacity does not impose on it the duty, or give it the right, to institute an inquiry into the conduct of its customer in order to protect those for whom he may hold the fund, but between whom and the bank there is no privity.''

In *Santa Marina Co. v. Canadian Bank of Commerce,* 254 Fed. 391, the circuit court of appeals for the 9th circuit, having before it a case where the secretary of a corporation was authorized to endorse checks payable to the company with the name of the company and deposit them to the credit of the company in its bank, certain checks were endorsed by the secretary, in blank, with the company's name, and deposited to his own credit in the defendant bank, the proceeds of which he later converted to his own use. In the decision, the court stated that there was no evidence that the bank had any notice that the checks deposited by the secretary were not his property, or that the bank acted in bad faith, and held that his authority to endorse the checks in blank was complete, although plaintiff's officers may have supposed that they had limited his authority to depositing all the checks in plaintiff's bank, and no evidence that they actually did so, or that they required him to so endorse the checks.

The court said that it followed that when Hooper, the secretary, tendered the checks in question to the bank for deposit to the credit of his own account, the

title passed on delivery, unless the defendant, the bank, had timely notice that Hooper had no title to them, or there was some act of bad faith on the part of defendant in receiving the checks. There is no such evidence in the record.

This is the case here.

The same rule applied in *Kendall v. Fidelity Trust Co.,* 230 Mass. 238, 119 N. E. 861. In that case it was held that if the bank, acting in good faith, merely credits trust funds, knowing them to be such, to the personal account of a fiduciary, it will not be liable if he misappropriates the funds. It was also said in that case that the weight of authority was in accord with that view.

Of course, the rule is different if the bank knows, or is chargeable with knowledge, of the fraud, or receives a benefit from the transaction, or knows that the fiduciary is paying a debt of his own with the funds deposited, or anything of the sort. That principle was announced by the highest judicial authority of Great Britain in *Gray v. Johnston,* 3 L. R. H. L. 1, as follows:

"In order to hold a banker justified in refusing to pay a demand of his customer, the customer being an executor, and drawing a cheque as an executor, there must, in the first place be some misapplication, some breach of trust intended by the executor, and there must in the second place, as was said by Sir John Leach, in the well known case of *Keane v. Robarts,* 4 Madd. 357, be proof that the bankers are privy to the intent to make this misappropriation of the trust funds. And to that I think I may safely add, that if it be shown that any personal benefit of the bankers themselves is designed or stipulated for, that circumstance, above all others, will most readily establish the fact that the bankers are in privity with the breach of trust which is about to be committed."

There was a case in Kansas which came twice before the supreme court of that state. The first being *Chamberlain Metal Weather Strip Co. v. Bank of Pleasanton*, 98 Kan. 611, 160 Pac. 1138, then appealed from a ruling on objection to testimony under a petition alleging that Haskell, the agent, had no authority to endorse the check, and that the instrument was a forgery, and he had no authority to make collection upon plaintiff's account. A demurrer of defendant was overruled, and it answered by general denial. On the opening statement of counsel in harmony with pleadings, the objection to the introduction of the testimony was sustained by the trial court. The general rules of the law merchant were set forth in that action and the case remanded for trial. On trial, the plaintiff recovered judgment against the defendant bank, which appealed, and the decision is reported in 107 Kan. 79, 190 Pac. 742. In the last case the syllabus, written by the court, reads:

"A corporation of Michigan sent its agent to Kansas to contract for and supply weather strips to such customers as he could induce to purchase them. The form of contract furnished to and used by him provided for payment in cash on completion of the work. On completing a contract with one customer she gave him a check on a local bank whose cashier knew he had been in the vicinity for some time filling similar contracts. The agent indorsed the check "Chamberlain Metal Weatherstrip Co. by Sprague T. Haskell, Agent," and the bank paid it to the agent, who absconded with the proceeds. *Held*, that the principal cannot compel the bank to pay to it the amount of the check thus endorsed and collected by its agent."

In *Miami County Bank v. State ex rel. Peru Trust Co.*, 61 Ind. App. 360, 112 N. E. 40, that court reviewed a number of cases and stated the rule to be:

"An administrator or other person having charge of trust funds may deposit them in bank to the credit

of his personal account and check them out in the usual course of business and the bank, although it has knowledge of the character of the funds so deposited, is not thereby made liable to the beneficial, or actual owners of such funds, in the absence of any knowledge on its part that the funds are being misappropriated or misapplied by such trust officer."

Many other cases from other jurisdictions to the same effect could be cited, but most of them may be found in a monographic note to the case of *Allen v. Puritan Trust Co.*, 211 Mass. 409, 97 N. E. 916, L. R. A. 1915C 518, and cases which have been cited and quoted herein.

In our case of *Island Belt S. S. Co. v. Cafe, supra,* which depends more upon the apparent authority of the agent than the real, we said that the former purser of the steamship company, who had cashed certain checks with the defendant Cafe, on endorsements made by him, was, to all outward appearances, the general business representative of appellant, especially at the Seattle end of the line, and that it was his duty to solicit business, collect freight and passenger charges, and pay expenses. The court held that, although he had ceased to be purser for the company, and his authority had entirely ceased, he still had apparent authority to cash the checks.

It is plain in this case that respondents sent Watts as their agent and manager to Seattle for the purpose of selling some kind of stocks, and gave him authority to endorse checks generally in blank, with only undisclosed authority, when checks were so endorsed, to deposit in a bank to be selected also by him in Seattle for respondents' business. So far as any personal dealing with respondents in Seattle and vicinity was concerned, Watts was the firm. He not only had actual authority, but apparent authority, in such matters as

that involved here. The principles stated and applied in the *Mott Iron Works* case, *supra,* are therefore particularly applicable here. Those principles, as we have shown, have been very generally supported by the courts of other jurisdictions.

We are convinced, therefore, that the judgment of the trial court was erroneous, and that it should be reversed and the action dismissed.

It is so ordered.

TOLMAN, C. J., ASKREN, and FULLERTON, JJ., concur.