[No. 630-2.    Division Two.    January 16, 1973.]

E. L. VON GOHREN, *Respondent*, v. PACIFIC NATIONAL BANK
OF WASHINGTON, *Appellant.*

Action to recover embezzled funds. Appeals taken from a judgment entered on a verdict substantially in favor of the plaintiff.

*Warren J. Daheim* and *William E. Holt* (of *Gordon, Thomas, Honeywell, Malanca, Peterson, O'Hern & Johnson*), for appellant.

*Leo C. Kendrick* (of *Gavin, Robinson, Kendrick, Redman & Mays*), for respondent.

PEARSON, C.J.—This appeal requires a determination of the legal rights and responsibilities of two relatively innocent parties, both of whom were victimized by the criminal activities of a fiduciary.

Resolution of the issues requires an interpretation of certain provisions of articles 1, 3, and 4 of the Uniform Commercial Code, RCW 62A.1-101, *et seq.* The facts are largely undisputed.

In the fall of 1967, plaintiff (respondent, E. L. Von Gohren, d/b/a Fencing and Awning Company) hired Ella Martin as the bookkeeper and general office assistant of his retail business. Plaintiff did not check her references prior

to employing her, but was able to obtain a $10,000 fidelity bond, conditioned on her faithful performance. She was then placed in almost sole control of plaintiff's financial affairs. She was authorized to write and sign plaintiff's checks, post them, reconcile bank statements, and prepare profit and loss statements and balance sheets.

Plaintiff's business account was in the Bank of Yakima, where plaintiff signed an authorization which allowed Mrs. Martin to sign checks on behalf of plaintiff and to endorse checks in blank and deposit them in the Bank of Yakima. During the ensuing months, Mrs. Martin not only signed most of plaintiff's checks, including payroll checks, but she also reconciled the monthly bank statement. This fact made plaintiff particularly vulnerable to the criminal activity of Mrs. Martin, which culminated in this suit.

On November 10, 1967, Mrs. Martin deposited two checks in her personal account with defendant (appellant, Pacific National Bank of Washington). One check she had drawn on plaintiff's account, payable to herself. The second was a customer's check payable to "Fencing and Awning" which she endorsed (referred to as a third-party check.) Both checks were honored, the former by the Bank of Yakima. Contrary to its own established procedures, and contrary to the custom of the banking industry, defendant made no effort to ascertain the authority of Mrs. Martin to deposit the third-party check to her personal account. Likewise, no inquiry was made to ascertain her authority to draw checks on her employer's account, but the testimony supported the conclusion that such inquiry was not customarily made in a deposit situation.

During the next 14 months, Mrs. Martin engaged in similar conduct, usually depositing plaintiff's checks at the drive-in window of defendant's bank during the busiest days and hours of the week. She covered these transactions by removing the canceled checks payable to herself from the monthly bank statements. She also forced balances on the company books to cover her activities.

The embezzlements were not discovered by plaintiff until

January or February, 1969, when cash shortages caused plaintiff to review his bank statements. The trial court noted, "if he [plaintiff] had exercised his own internal controls and not blindly trusted this lady, he would have discovered sooner than he did what was happening to his business."

After discovery of the losses, Mrs. Martin was imprisoned for a time, and later repaid plaintiff approximately $5,000. The bonding company has also paid plaintiff $10,000.

This action was brought by plaintiff against defendant, seeking recovery of the following:

(1) $20,846.68, representing checks which defendant had either cashed for Mrs. Martin or credited to her account over her unauthorized endorsement, and which were payable to plaintiff from various customers.

(2) $10,600.98, representing unauthorized checks which Mrs. Martin had drawn on plaintiff's account in the Bank of Yakima payable to herself.

(3) $545.61, representing monies Mrs. Martin had embezzled from plaintiff's petty cash fund.

(4) $15,146.09, representing the alleged costs incurred by plaintiff for accountants and lawyers in order to discover Mrs. Martin's wrongful acts.

(5) Six percent interest on the amount of each check negotiated by defendant from the time of its negotiation.

(6) $4,546.61 in costs incurred in effecting collection.

In general, plaintiff contended alternatively that defendant's negligence proximately caused the claims outlined above or the losses were occasioned by defendant's conversion of the sums involved.

Defendant answered by denying that the transactions were unauthorized or that defendant was guilty of negligence or of conversion of plaintiff's funds. Affirmatively, defendant pleaded contributory negligence, assumption of risk, estoppel, and that plaintiff was not the real party in interest in the action.

The case was tried to a jury. At the conclusion of plaintiff's case, the trial court sustained defendant's challenge to

all of the claims except for item 1—representing checks payable to plaintiff which Mrs. Martin had negotiated to defendant by endorsement. This claim was submitted to the jury on the negligence theory, with the plaintiff's contributory negligence also submitted in substantial accord with RCW 62A.3-406. The jury found in plaintiff's favor in the sum of $21,338.19, to which the court allowed interest on each check from the date it was negotiated to the date of the verdict. Judgment was entered in plaintiff's favor in the total sum of $25,521.43.

Defendant appeals from that judgment and plaintiff cross-appeals from the judgment of dismissal of the other claims.

We consider initially defendant's appeal. Twelve of the sixteen assignments of error relate to a single question—did the trial court erroneously apply a negligence standard to defendant's conduct, rather than a standard of bad faith requiring actual knowledge by defendant of Mrs. Martin's breach of her fiduciary duty to plaintiff?

In support of its contention that a negligence standard was inapplicable, defendant claims that it was a holder in due course as to the checks which were endorsed by Mrs. Martin and deposited to her personal account, and consequently the instruments were taken by defendant free from all claims against them by any person. RCW 62A.3-302; RCW 62A.3-305.

It is apparent that if defendant does qualify as a holder in due course, plaintiff would be denied the claims and defenses otherwise available to him under RCW 62A.3-306.[1]

That the defendant could be a holder in due course if the requirements of RCW 62A.3-302 were satisfied cannot be doubted. *See* 62A.4-208 and 62A.4-209. A holder in due course is a holder who takes an instrument "(a) for value;

---

[1]RCW 62A.3-306 provides, in part: "Unless he has the rights of a holder in due course any person takes the instrument subject to (a) all valid claims to it on the part of any person; and (b) all defenses of any party which would be available in an action on a simple contract; . . ."

and (b) in good faith; and (c) without notice . . . of any defense against or claim to it on the part of any person." RCW 62A.3-302(1).

Assuming, without deciding, that defendant was a holder who gave value,[2] the question we must determine is whether it acted in *good faith* and *without notice* of plaintiff's claim. In making this analysis, we are assuming that defendant did not exercise reasonable care under commercially recognized standards in accepting the third-party checks for deposit in Mrs. Martin's personal account, upon her endorsement (the jury finding). The precise issue, then, is whether the "good faith" or "without notice" requirements encompass a reasonable care standard. If they do not, then it was error to allow the jury to determine defendant's liability on that standard of care.

This question is one of first impression in Washington since adoption of the Uniform Commercial Code. In tracing the history of the code, it is apparent at the outset that the drafters intended to eliminate a reasonable care standard from the "good faith" requirement.

"Good faith" is defined in RCW 62A.1-201(19) as "honesty in fact in the conduct or transaction concerned." Since there is no separate definition of good faith in article 3, the article 1 definition would, in our view, control. *See* RCW 62A.1-201(19). Prior to the adoption of the code, the authorities were split on the question of whether the test for good faith was a subjective one or involved some element of commercial reasonable behavior (the so-called objective standard). *See* Britton, *Bills and Notes* § 101 (2d ed. 1961). The Negotiable Instruments Law, as adopted in Washington, appears to have enunciated a subjective test (RCW 62.01.056) by requiring actual knowledge of an infirmity before a person was deemed to have taken an instrument in bad faith. The Supreme Court previously applied this test

---

[2]*See* RCW 62A.3-207, RCW 62A.4-208 and RCW 62A.4-209. A bank which cashes a check drawn on another bank has a security interest and is a holder for value. *Suit & Wells Equip. Co. v. Citizens Nat'l Bank,* 263 Md. 133, 282 A.2d 109 (1971).

of good faith. *Mott Iron Works v. Metropolitan Bank,* 78 Wash. 294, 139 P. 36 (1914); *Rice v. Peoples Sav. Bank,* 140 Wash. 20, 247 P. 1009 (1926); *cf. Bowles v. Billik,* 27 Wn.2d 629, 178 P.2d 954 (1947).

The first draft of the Uniform Commercial Code released in 1949 and which was *not* approved by the American Law Institute nor the National Conference of Commissioners on Uniform State Laws defined good faith in section 1-201 (16) as:

> "Good faith" means honesty in fact in the conduct or transaction concerned. *Good faith includes good faith toward all prior parties and observance by a person of the reasonable commercial standards of any business or trade in which he is engaged.*

(Italics ours.) When the final draft was approved, the italicized sentence was deleted and only the first sentence was left.

This history makes it rather clear that a reasonable conduct standard was intentionally omitted from the good faith requirement. The resulting subjectivity of this test of good faith has received criticism from the scholars because of the difficulty in ascertaining the subjective honesty of the taker. *See* 40 Wash. L. Rev. 281, 290 (1965). Nevertheless, the intention of the drafters as shown by the history was to remove the requirement of reasonable conduct from the good faith requirement to qualify one as a holder in due course.

■ However, plaintiff argues that a holder in due course, in addition to acting in "good faith," must also take an instrument "without notice . . . of any . . . claim . . ." RCW 62A.3-302(1)(c). The latter requirement, it is argued, should include the concept of reasonable conduct, again by referring to the article 1 definition of notice (RCW 62A.1-201(25)), which provides:

> A person has "notice" of a fact when (a) he has actual knowledge of it: or
> (b) he has received a notice or notification of it; or

(c) from all the facts and circumstances known to him at the time in question he has *reason to know* that it exists. (Italics ours.)

The phrase, "reason to know," is not defined in the code, but a useful explanation of the phrase appears in the comments to section 9 of the Restatement (Second) of Agency, comment *d* at 46 (1958):

A person has reason to know of a fact if he has information from which a person of ordinary intelligence, or of the superior intelligence which such person may have, would infer that the fact in question exists or that there is such a substantial chance of its existence that, *if exercising reasonable care* with reference to the matter in question, his action would be predicated upon the assumption of its possible existence.

(Italics ours.)

This argument makes the "reason to know" method of notice an objective one, and would not require that a taker have *actual knowledge* of an adverse claim in order to be charged with notice of such claim, but would premise notice upon reasonable commercial standards.

This line of reasoning has the support of at least one scholar. *See* 2 Bender's UCC Service, F. Hart & W. Willier, *Commercial Paper* § 11.05(2) (1972). We agree with the logic of the argument. The code has seen fit to distinguish "good faith" and "notice" by setting them forth as two separate requirements and, in article 1, in defining them separately. The problem, however, is that article 3 does contain a section dealing with "notice to purchaser" by which notice can be ascertained in a variety of situations. RCW 62A.3-304.

Certain of the provisions of that section are amenable to and require use of the article 1 definition of notice as contained in subsection (c) of RCW 62A.1-201(25). Other provisions, however, are not amenable to that definition and in that event the provisions of article 3 would control.

█ Defendant contends that the facts of this case fall within the provisions of RCW 62A.3-304(2) and (4)(e) as follows:

(2) The purchaser has notice of a claim against the instrument when he has knowledge[3] that a fiduciary has negotiated the instrument in payment of or as security for his own debt *or in any transaction for his own benefit* or otherwise in breach of duty.

. . .

(4) Knowledge of the following facts does not of itself give the purchaser notice of a defense or claim

. . .

(e) that any person negotiating the instrument is or was a fiduciary; . . .

(Italics ours.) The official comment 5 (Uniform Commercial Code § 3-304) in explanation of these provisions states:

Subsection (2) follows the policy of Section 6 of the Uniform Fiduciaries Act, and specifies the same elements as notice [actual knowledge] of improper conduct of a fiduciary. Under paragraph (e) of subsection (4) mere notice of the existence of the fiduciary relation is not enough in itself to prevent the holder from taking in due course, *and he is free to take the instrument on the assumption that the fiduciary is acting properly.* The purchaser may pay cash into the hands of the fiduciary without notice of any breach of the obligation.

(Italics ours.)

Under section 6 of the Uniform Fiduciaries Act,[4] a bank is not bound to inquire whether the fiduciary is committing a breach of his obligation as fiduciary in transferring the instrument, . . . unless he takes the instrument with *actual knowledge* of such breach or with knowledge of such facts that his action in taking the instrument amounts to *bad faith.*[5]

(Italics ours.) Thus, the argument is made that the drafters of the code intended to eliminate a reasonable care stand-

---

[3]Section 25 of RCW 62A.1-201 defines knowledge as "actual knowledge."

[4]*See* 7 Uniform Laws, Annotated 407 (1970).

[5]Washington law, prior to adoption of the Uniform Commercial Code, was even more protective of banks dealing with fiduciaries than those subject to the Uniform Fiduciaries Act. *See* RCW 62.01.0195; *General Cas. Co. of America v. Seattle-First Nat'l Bank,* 42 Wn.2d 433, 256 P.2d 287 (1953).

ard from the duty of one dealing with a fiduciary; and that the code permits one to be a holder in due course whether negligent or not, unless one acted with *actual knowledge* of the breach or *in bad faith. See Citizens Bank & Trust Co. v. Limpright,* 93 Wash. 361, 160 P. 1046 (1916); *Gray v. Boyle,* 55 Wash. 578, 104 P. 828 (1909); *Rice v. Peoples Sav. Bank,* 140 Wash. 20, 247 P. 1009 (1926).

The flaw in this argument as applied to this case is two-fold. In the first place, RCW 62A.3-304 (2) establishes notice where the fiduciary deals with the instrument for his (her) own benefit. The act of depositing the third-party checks payable to her employer in her personal account is, we think, such a transaction. We can hardly conceive of a clearer case of "personal benefit" unless Mrs. Martin actually used the checks to pay personal debts, which of course she is free to do when her account has been credited by the amounts represented by the third-party checks.

Secondly, we started this analysis by assuming that defendant was a holder for value. To make that assumption, defendant must have acquired the instruments by negotiation, by authorized signature or endorsement. *See* RCW 62A.3-404 and RCW 62A.1-201 (43). The evidence is undisputed that Mrs. Martin was required by her actual authority to deposit these third-party checks in her employer's account in the Bank of Yakima. We could hardly conclude that her negotiation of the checks to defendant for deposit in her personal account was authorized.

■■ For these reasons, we conclude that defendant did not establish its status as a holder in due course of the third-party checks as a matter of law, and, as a consequence, took them subject to plaintiff's claim. RCW 62A.3-306. Under the circumstances, the trial court would have been justified in finding this issue in plaintiff's favor as a matter of law. Furthermore, from our review of the evidence, we think the trial court would have been justified in directing a verdict in favor of plaintiff with reference to these third-party checks. RCW 62A.3-406, under which the case went to the jury, is somewhat different from the usual common-

law rules of negligence and contributory negligence. That provision does not allow the defense of substantial contributory negligence as to a holder (who is not a holder in due course) unless the holder has acted "in accordance with the reasonable commercial standards . . ."

It is our view that since defendant had notice of the claim by virtue of RCW 62A.3-304(2), and since it is undisputed that defendant did nothing to investigate Mrs. Martin's authority to negotiate checks payable to her employer, we must hold as a matter of law it did not act in accordance with reasonable commercial standards. By this reasoning, plaintiff's negligence did not preclude him from asserting Mrs. Martin's lack of authority.

It is our further view that the provisions of this part of the code should be construed so that the rights and liabilities of the parties, absent serious factual dispute, are ascertainable without resort to expensive and delaying litigation over each item which might be paid on an unauthorized signature or endorsement. The code, we think, even though vague and inconclusive as to application in many respects, was intended to facilitate commercial transactions without resort to litigation. Considering the provisions of the code as a whole does, we think, lead to the conclusion that, except for certain limited circumstances, the one who accepts an instrument on an unauthorized signature or endorsement was intended to be liable to the true owner of the instrument.

Such a result is totally consistent with the general pre-code rule. *See Gresham State Bank v. O & K Constr. Co.,* 231 Ore. 106, 370 P.2d 726, 100 A.L.R. 654 (1962), *opinion clarified,* 372 P.2d 187 (1962). The result is also fully in accord with defendant's internal procedures, which prohibit its employees from accepting such checks without a resolution of authority from the principal. This procedure, the evidence showed, is also a customary procedure in the banking industry, and accordingly, was admissible.

We also agree with the trial court's determination to allow interest on the amount of each check from the date

of its negotiation to the time of trial. The amounts were fully liquidated. *Prier v. Refrigeration Eng'r Co.,* 74 Wn.2d 25, 442 P.2d 621 (1968).

We turn now to plaintiff's cross-appeal. Plaintiff urges that inquiry by defendant with reference to the third-party checks would have disclosed the embezzlement scheme. Inquiry, plaintiff urges, would have prevented the losses plaintiff sustained by reason of the checks drawn by Mrs. Martin on plaintiff's account, payable to herself and negotiated to defendant by her endorsements. It is also urged that inquiry by defendant would have avoided the loss suffered by plaintiff of petty cash embezzled from an office fund, as well as the costs of lawyers and accountants engaged to uncover the embezzlements and press the claim.

[7] It may be arguable that there is a causal connection which justified submitting these claims to the jury under RCW 62A.3-406. However, there was no restriction on Mrs. Martin's actual authority to draw checks on plaintiff's account. She did, in fact, draw her own salary checks. Had defendant made inquiry concerning these checks to the Bank of Yakima, the latter would have confirmed her authority.[6] Since plaintiff did not restrict her authority, however, we agree with the trial court that he should be precluded as a matter of law from making a claim inconsistent with the authority actually given. *See* RCW 62A.3-406.

There is another compelling reason for reaching this conclusion. All checks drawn on plaintiff's account were reflected in the monthly bank statements which he received. Even cursory attention to these statements would have revealed that the Bank of Yakima was charging his account for checks which were not returned to him. (Mrs. Martin removed these items from the statements.) The means of discovering these particular embezzlements were

---

[6]By contrast, inquiry by defendant to the Bank of Yakima regarding the third-party checks would not have confirmed her authority to endorse checks in blank or for deposit to her account with defendant, since Mr. Von Gohren's written authorization on file with the Bank of Yakima related only to deposits to or withdrawals from his account.

solely within plaintiff's control. On the other hand, the fact that the Bank of Yakima honored these checks from the beginning transaction and for some 14 months thereafter, as it was authorized to do, was, in effect, a communication of Mrs. Martin's actual authority to defendant. Under these circumstances, we think defendant established its status as a holder in due course and was not subject to plaintiff's claim. RCW 62A.3-305.

■ We reject the contention that plaintiff established defendant's liability on a conversion theory under RCW 62A.3-419. None of the checks negotiated to defendant were "paid on a forged indorsement."

We are somewhat concerned with the logic of plaintiff's argument that since Mrs. Martin initially deposited to her account a third-party check and one check which she had drawn on plaintiff's account, the notice given on the former would have revealed the entire embezzlement scheme. However, plaintiff offered no evidence to show that defendant's internal control procedures would have treated the two items together. Considering the thousands of checks being processed daily, we are unwilling to make that basic assumption, particularly where different drawee banks were involved.

Finally, defendant contends that it should have received a credit for those funds plaintiff recovered from the bonding company and from Mrs. Martin's voluntary restitution. No authority is cited for this proposition. In this regard, the evidence demonstrated that the two bonding companies who had bonded Mrs. Martin for $5,000 each were entitled to pro rata reimbursement from any sums recovered by plaintiff. Thus, aside from application of the collateral source rule, plaintiff had not at the time of trial or even after judgment effected a double recovery. We do not reach the question of who, as between plaintiff and defendant, would have the right to additional restitution which might result in a double recovery to plaintiff.

Judgment affirmed.

PETRIE and ARMSTRONG, JJ., concur.

Petition for rehearing denied March 27, 1973.