AMERICAN MACHINE TOOL DISTRIB-
UTORS ASSOCIATION, Appellant,

v.

NATIONAL PERMANENT FEDERAL
SAVINGS AND LOAN ASSOCIA-
TION, Appellee.

No. 80–1196.

District of Columbia Court of Appeals.

Argued Sept. 10, 1981.

Decided July 27, 1983.

---

John S. Koch, Washington, D.C., with whom Jane H. Chalmers, Washington, D.C., was on the brief, for appellant.

Maurice J. Montaldi, Washington, D.C., with whom George H. Beuchert, Jr., Washington, D.C., was on the brief, for appellee.

Before NEBEKER, MACK and FERREN, Associate Judges.

MACK, Associate Judge:

Appellant, American Machine Tool Distributors Association ("AMTDA"), brought a conversion action against the executor of its deceased employee's estate and against appellee, National Permanent Federal Savings and Loan Association ("National Permanent"), to recover money embezzled by its deceased employee. The trial court denied AMTDA's claim against National Permanent and held that the estate of AMTDA's Administrative Director, I.T. Budlong, Jr., was liable for all funds embezzled by decedent-Budlong.[1] AMTDA appeals the trial court's rejection of the claim against National Permanent and the conclusion that AMTDA's contributory negligence precludes it from asserting its employee's lack of authority in the conversion action against National Permanent. We find that the trial court's conclusion is based upon misapplication of the commercial code and that the evidence developed at trial supports the liability of National Permanent, as a matter of law, for the unauthorized payments. We therefore reverse and remand with directions that the amount of damages be determined and that judgment be entered for AMTDA against National Permanent in the amount commensurate with its conversion liability.

I

AMTDA is a non-profit trade association incorporated in the District of Columbia. During the relevant period, AMTDA had approximately 400 members and an annual operating budget of about $200,000. Its Washington office staff consisted of six employees, including a bookkeeper/Administrative Director, I.T. Budlong, Jr. Over the course of four and one-half years, Budlong embezzled from AMTDA almost $500,000. He executed this scheme by taking advantage of his responsibilities concerning AMTDA members' dues payments and through the use of his individual savings account with National Permanent.

Budlong's duties at AMTDA included invoicing members' dues, logging those dues payments in AMTDA's ledgers and depositing the payments into AMTDA's bank accounts at Riggs National Bank and American Security Bank. He also prepared periodic financial reports for AMTDA's internal use. The amount of dues paid by each AMTDA member was known only to Budlong and AMTDA's Executive Vice President, James Kelley—the only AMTDA employees with access to AMTDA's dues ledgers. The purpose of this arrangement was to keep confidential the gross profit figures of members' businesses, an amount which could be calculated from dues figures. However, the arrangement also contributed to the ease with which Budlong carried out his embezzlement scheme.

In March 1973, Budlong opened an individual savings account, # 601–647–2, at National Permanent in the name I.T. Budlong, Jr. On the signature card, Budlong designated his address as "A.M.T.D.A., 1500 Massachusetts Avenue, N.W., Washington, D.C." From March through July 1973, Budlong deposited checks made payable to him ("I.T. Budlong," "I.T. Budlong, Administrative Director"), which were consistent with the nature of the account, an individual savings account. Beginning in August 1973 and continuing until September 1977, Budlong deposited over 1800 checks, made payable to "American Machine Tool Distributors Association" or to "AMTDA", into his individual savings account. The amount of these checks accounted for over 75% of the total amount of money deposited in this account from March 1973 through September 1977.

A brief description of the manner in which Budlong carried out his embezzlement scheme follows. After the end of each fiscal year (April 30), Budlong sent

---

1. AMTDA received $67,916 plus interest, the sum remaining in Budlong's account at National Permanent upon his death. However, the trial court held that AMTDA proved damages in the amount of $452,808. Therefore, judgment was rendered against Budlong's estate in the amount of $384,892 plus interest and costs.

blank dues invoice forms to each of AMT-DA's members. The members were directed to complete the form and to return it, with payment, to "I.T. Budlong, Jr., Director, Administrative Services." No direction was given regarding the manner in which checks were to be made payable. Consequently, checks were made payable in various forms, including "AMTDA", "American Machine Tool Distributors Association", "I.T. Budlong, Jr., Administrative Director", "I.T. Budlong" and "AMTDA, I.T. Budlong."

After receipt of dues payment checks, Budlong endorsed them "For Deposit Only, Credit account 601–647–2, AMTDA"[2] and deposited them into his individual saving account at National Permanent. The majority of both the deposit and withdrawal slips were completed with "AMTDA, I.T. Budlong, Jr., Director" designated as the account owner. Once dues payment checks were deposited, Budlong then withdrew money from his individual account and deposited these sums into AMTDA's accounts at Riggs National Bank and American Security Bank, while retaining portions of the dues payments in his individual account.

To account for the sums diverted to his own use, Budlong systematically forged dues payment invoices and ledger entries to indicate dues payments at levels lower than those actually paid. In this manner, he accounted for and hid the amounts diverted from dues payments for his own use. In

September 1977, shortly before this scheme was uncovered, Budlong committed suicide.

## II

■ The trial court concluded that pursuant to D.C.Code § 28:3–419(1)(c) (1981),[3] there was a conversion of checks made payable to AMTDA and deposited into Budlong's individual account at National Permanent. It held that AMTDA was precluded from recovering money from checks made payable to "I.T. Budlong, Jr.," "I.T. Budlong, Administrative Director", and "I.T. Budlong, Administrative Director, AMTDA" since these checks were properly payable to Budlong pursuant to D.C.Code §§ 28:3–111, 3–117(a) and (c) (1981). It further held concerning the remaining checks that AMTDA is precluded from asserting Budlong's lack of authority against National Permanent pursuant to D.C.Code §§ 28:3–404(1), 3–406 (1981). On appeal, AMTDA asserts the following grounds for reversal: (1) that the court wrongfully placed the burden of proving that National Permanent's conduct did not comport with reasonable commercial standards on AMT-DA; (2) that even if the court placed the burden on the proper party (National Permanent), its holding that National Permanent's conduct comported with these standards was clearly erroneous and not supported by the record evidence; (3) that the court erred in excluding some of AMTDA's evidence bearing on the reasonable commercial standards issue;[4] (4) that the evi-

**2.** Initially, Budlong typed this endorsement on the back of the checks. However, early on Budlong acquired and used an unauthorized rubber stamp to endorse the checks in this same manner.

**3.** The District of Columbia Code sections referred to in this opinion are verbatim reenactments of the same code sections found in the 1973 version of the D.C.Code.

**4.** AMTDA's claim that the trial court abused its discretion in excluding the testimony of AMT-DA's expert witness on rebuttal deserves comment. The trial court refused to allow the proffered rebuttal testimony of AMTDA's expert witness, Henry Johnson, on the subject of "reasonable commercial standards" in savings and loan businesses. Johnson's testimony was

offered to rebut the testimony of National Permanent's witnesses, Heitmuller and Brown. These two lay witnesses (they were not qualified as experts) testified on the policies and practices within their respective institutions, Heitmuller on Interstate Federal Savings & Loan and Brown on Columbia Federal Savings & Loan. If their testimony is to have any relevance to the case, however, it is as probative testimony on the subject of "reasonable commercial standards" of the industry as a whole as indicated by the practices at Interstate and Columbia. See First Federal Savings & Loan Ass'n v. Union Bank & Trust, 291 N.W.2d 282, 286 (S.D.1980). Therefore, Johnson's expert testimony on industry standards would be proper rebuttal testimony.

The trial court ruled as follows:

dence does not support the court's conclusion that AMTDA itself was negligent; and (5) that AMTDA can recover, as consequential damages, the amounts of checks, mentioned above, which were properly paid to Budlong.[5] We agree with AMTDA's first two contentions and, therefore, reverse on those grounds.

## III

### A. Burden of Proof

■ Section 3–404(1) reads in part as follows:

Any unauthorized signature is wholly inoperative as that of the person whose name is signed *unless he . . . is precluded from denying it.* (Emphasis added.)

D.C.Code § 28:3–404(1) (1981). Ordinarily, an unauthorized signature will not bind the person whose name is signed. Official Comment 4 indicates, however, that the underscored words were intended to estop the person whose name is signed from denying the signature when his or her negligence permitted the making of the unauthorized signature. Uniform Commercial Code § 3–404 comment 4, 2 U.L.A. 326 (Master ed. 1977). Thus § 3–404(1) must be read in conjunction with § 3–406. *See* 2 R. ANDER-SON, UNIFORM COMMERCIAL CODE 940, § 3–406:3 (2d ed. 1971).

Section 3–406 reads in relevant part:

Any person who by his negligence substantially contributes . . . to the making of an unauthorized signature is precluded from asserting . . . the lack of authority against a drawee or other payor *who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.* (Emphasis added.)

D.C.Code § 28:3–406 (1981). This section complements § 3–404(1) and defines the circumstances in which one may be precluded from denying the authority of the one making an unauthorized signature. Section 3–406 sets up a "counter estoppel" or "conditional estoppel" under which a payor[6] may estop the party's assertion that the instrument was inoperative (*i.e.,* the signature was inoperative) only if that payor has paid the instrument in good faith and in accordance with the reasonable commercial standards of its business.[7] *Hermetic Refrigeration Co., Inc. v. Central Valley National Bank, Inc.,* 493 F.2d 476, 477 (9th Cir.1974); *J. Gordon Neely Enterprises, Inc. v. American National Bank,* 403 So.2d 887, 890 (Ala. 1981); *Continental Bank v. Wa-Ho Truck Brokerage,* 122 Ariz. 414, 419, 595 P.2d 206, 211 (1979); *Cooper v. Union Bank,* 9 Cal.3d

[I]t's my view that the purpose of rebuttal is to rebut testimony presented by [National Permanent].

Now, [National Permanent] witnesses have testified to practices in two institutions in the District of Columbia. According to your voir dire to Mr. Johnson, he has no direct relationship with either one of these institutions, Interstate or Columbia. So clearly you could not be rebutting their testimony, is that correct? [Tr. 1053–54]

I said I have not ruled that Mr. Johnson is not an expert in this area of savings and loans, but I did definitely rule that you have not qualified him as an expert as to the practices of certain phases of loan institutions which you choose to rebut. [Tr. 1060]

For the reasons stated above, this ruling constitutes an abuse of discretion.

5. Since we are remanding this case to the trial court for a determination of the amount of damages, we need not reach this claim. How-

ever, we note that § 3–419(2) of the commercial code states in part: "[t]he measure of liability [for conversion of an instrument] is presumed to be the face amount of the instrument." D.C.Code § 28:3–419(2) (1981).

6. U.C.C. Official Comment 2 states that the principles in § 3–406 extend to protect "payors who may not technically be drawers." Uniform Commercial Code § 3–406 comment 2, 2 U.L.A. 348 (Master ed. 1977). This describes National Permanent, who fits into the category "other payor."

7. U.C.C. Official Comment 6 states: "Thus any bank which takes or pays an altered check which ordinary banking standards would require it to refuse cannot take advantage of the estoppel." Official Comment 7 states that the same rule also applies where there is payment over an unauthorized signature. Uniform Commercial Code § 3–406 comments 6 and 7, 2 U.L.A. 349 (Master ed. 1977).

371, 385, 107 Cal.Rptr. 1, 12, 507 P.2d 609, 620 (1973) (en banc); *Perley v. Glastonbury Bank & Trust Co.,* 170 Conn. 691, 699, 368 A.2d 149, 153 (1976); *Travelers Insurance Co. v. Jefferson National Bank,* 404 So.2d 1131, 1133 (Fla.Dist.Ct.App.1981); *Trust Company of Georgia Bank v. Port Terminal & Warehousing Co.,* 153 Ga.App. 735, 737–40, 266 S.E.2d 254, 257–58 (1980); *Empire Moving and Warehouse Corp. v. Hyde Park Bank & Trust Co.,* 43 Ill.App.3d 991, 997, 2 Ill.Dec. 753, 757, 357 N.E.2d 1196, 1200 (1976); *Aetna Casualty & Surety Co. v. Hepler State Bank,* 6 Kan.App.2d 543, 630 P.2d 721, 728 (1981); *Owensboro National Bank v. Crisp,* 608 S.W.2d 51, 53 (Ky.1980); *Bank of Southern Maryland v. Robertson's Crab House, Inc.,* 39 Md.App. 707, 723, 389 A.2d 388, 397 (1978); *First National Bank v. Hovey,* 10 Mass.App. 715, ——, 412 N.E.2d 889, 894 (1980); *Salsman v. National Community Bank,* 102 N.J.Super. 482, 493, 246 A.2d 162, 168 (1968); *Mott Grain Co. v. First National Bank & Trust Co.,* 259 N.W.2d 667, 670–71 (N.D.1977); *Gresham State Bank v. O & K Construction Co.,* 231 Or. 106, 125, 370 P.2d 726, 735–36, *reh'g denied,* 231 Or. 106, 372 P.2d 187 (1962) (en banc); *Seattle-First National Bank v. Pacific National Bank,* 22 Wash. App. 46, 59, 587 P.2d 617, 625 (1978); *Swiss Baco Skyline Logging, Inc. v. Haliewicz,* 18 Wash.App. 21, 32, 567 P.2d 1141, 1148 (1977); *Von Gohren v. Pacific National Bank,* 8 Wash.App. 245, 254, 505 P.2d 467, 474 (1973); 2 R. ANDERSON, UNIFORM COMMERCIAL CODE 941, § 3–406:5 (2d ed. 1971).

■ Thus, the question of AMTDA's negligence in permitting Budlong's forgeries to go undiscovered is legally irrelevant until National Permanent establishes that it acted according to the reasonable commercial standards of its business when it paid the checks over those unauthorized endorsements.[8] *See Perley v. Glastonbury Bank & Trust Co., supra,* 368 A.2d at 153; *Owensboro National Bank v. Crisp, supra,* 608 S.W.2d at 53. Only then can National Permanent assert the § 3–406 defense of negli-

gence. Therefore, "before it can take advantage of the estoppel [in § 3–406], the bank must first show that it acted in accordance with the reasonable commercial standards of the banking business." *Swiss Baco Skyline Logging, Inc. v. Haliewicz, supra,* 567 P.2d at 1148. *See Hermetic Refrigeration Co., Inc. v. Central Valley National Bank, Inc., supra,* 493 F.2d at 477; *Travelers Insurance Co. v. Jefferson National Bank, supra,* 404 So.2d at 1133; *Trust Company of Georgia Bank v. Port Terminal & Warehousing Co., supra,* 266 S.E.2d at 259; *First National Bank v. Hovey, supra,* 412 N.E.2d at 893–94.

Hence, it was National Permanent's burden to prove that it acted in accordance with the reasonable commercial standards of the savings and loan industry. However, in applying § 3–406, the trial court improperly placed upon AMTDA the burden of establishing that National Permanent did not "act in good faith and in accordance with the reasonable commercial standards" with respect to its handling of the checks Budlong presented for payment and it accepted for deposit into his individual savings account. This is evident from the conduct of the trial and from the trial court's findings.

At trial, AMTDA unsuccessfully attempted to introduce into evidence a banker's manual on the issue of "reasonable commercial standards." This was at the close of both parties' cases. During the attempt, this colloquy ensued:

> [AMTDA's COUNSEL]: ... to draw some arbitrary distinction between a savings and loan association and a bank is something that seems to me that [National Permanent] has the burden of drawing.
> THE COURT: [National Permanent] doesn't have to prove a thing in this case. And I'm sure—
> [NATIONAL PERMANENT'S COUNSEL]:
> Your Honor, I'm not here to engage in testimony. I dispute it anyway. But I

---

8. It is undisputed that National Permanent act- ed with good faith.

object. No foundation. Totally irrelevant.

THE COURT: [National Permanent] doesn't have to prove one thing in this case. As far as I know, you didn't file a counterclaim, is that correct?

[NATIONAL PERMANENT'S COUNSEL]:

No, Your Honor.

THE COURT: As far as I know [National Permanent] doesn't have to prove one thing in this case. The affirmative, the burden, is on [AMTDA] in this case.

We also know that the court improperly placed on AMTDA the burden of proving National Permanent's bad faith. In Finding of Fact No. 20, the court stated:

The evidence further establishes that National Permanent acted in good faith with respect to its handling of the checks presented for payment by Budlong and accepted for deposit into the savings account. [AMTDA] has failed to prove by a preponderance of the evidence that National Permanent did not act in good faith.

However, that National Permanent acted in good faith is not disputed. In any event, Finding No. 20 is probative of the trial court's misplacing the burden of proof concerning "reasonable commercial standards."

Finally, in Conclusion of Law No. 7 the court held:

Additionally, the Court concludes upon the evidence adduced at trial that National Permanent acted in good faith and in accordance with the reasonable commercial standards of its business. While it may be the general policy of a savings bank such as National Permanent not to deposit checks made payable to a corporation into an individual account, the *evidence failed to establish that the employees of [National Permanent] had reason to know that AMTDA is a corporation.* It is not contrary to reasonable commercial standards to accept for deposit a check endorsed by way of a rubber stamp. Neither is it contrary to reasonable commercial standards for a bank not

to verify the signature of a customer, once that customer becames known to the employees. The evidence clearly demonstrates that Budlong operated in a manner that caused the employees of National Permanent to become familiar with him. (Emphasis added.)

From the underscored segment, it is clear that the court found persuasive AMTDA's failure to establish the "reason to know" of National Permanent's employees. This fact may need to be established by AMTDA only if AMTDA had the burden of showing that National Permanent's actions did not comport with reasonable commercial standards. It did not have this burden. Therefore, since the trial court misapplied the burden of proof, we must reverse its ruling that AMTDA is precluded from asserting Budlong's lack of authority or from denying the unauthorized signature on the checks. However, rather than remand for a new trial, for the following reasons we hold that judgment should be entered for AMTDA against National Permanent, as a matter of law.

## B. Reasonable Commercial Standards

The trial court held in Conclusion of Law No. 3 that there was a conversion of checks made payable to AMTDA and deposited into Budlong's account at National Permanent. In Conclusion of Law No. 7, *supra,* the trial court further concluded that National Permanent acted in accordance with the reasonable commercial standards of its business. However, based on the entire record, we hold that this conclusion is clearly wrong and without supporting evidence. D.C.Code § 17–305 (1981). We hold that as a matter of law National Permanent did not follow the reasonable commercial standards of its business.

Several courts have held as a matter of law that it is commercially unreasonable for a bank to accept for deposit in an individual account a check made payable to a corporation, without first ascertaining, or at least inquiring as to, the authority of the depositor/endorser. *Aetna Casualty & Surety Co.*

*v. Hepler State Bank, supra,* 630 P.2d at 728; *Gresham State Bank v. O & K Construction Co., supra,* 370 P.2d at 733–34 (employees of payor lulled themselves into false inference of authority by individual who was paid); *Swiss Baco Skyline Loggings, Inc. v. Haliewicz, supra,* 567 P.2d at 1148 (bank's own teller manual requires finding specific authority before cashing checks payable to or endorsed by corporation); [9] *Von Gohren v. Pacific National Bank, supra,* 505 P.2d at 474. Other courts have taken judicial notice that a bank is required to at least inquire as to the reason and authority for depositing a check with a corporate payee into a third party's account. *National Bank of Georgia v. Refrigerated Transport Co., Inc.,* 147 Ga.App. 240, 243–44, 248 S.E.2d 496, 499–500 (1978) (bank is not relieved of duty to inquire even when depositor of check is customer of the bank); *Belmar Trucking Corp. v. American Trust Co.,* 65 Misc.2d 31, 35–36, 316 N.Y.S.2d 247, 251–52 (N.Y.Civ.Ct.1970); *Mott Grain Co. v. First National Bank & Trust Co., supra,* 259 N.W.2d at 671; *Seattle-First National Bank v. Pacific National Bank, supra,* 587 P.2d at 625 (factual findings similar to evidence presented by AMTDA).

Beginning in August 1973, National Permanent accepted for deposit into an individual account checks made payable to AMTDA. The evidence presented at trial indicated that no inquiry as to Budlong's authority was made even though National Permanent was shown, by AMTDA, to have had the following internal policies throughout 1973–77:

15. DO NOT ACCEPT CHECKS FOR DEPOSIT WHEN THE PAYEE AND/OR ENDORSEMENT IS THAT OF A CORPORATION AND IS OFFERED FOR DEPOSIT TO ANY ACCOUNT OTHER THAN THE CORPORATION ACCOUNT. (Plaintiff's Exhibit 29).

It is an absolute "NO–NO" to accept checks to personal accounts when such checks are made payable to corporations, churches, associations, partnerships, organizations, etc.

If such checks are received and accepted they must be credited to an account in the same name as the payee. Example: Check made payable to ABC Corporation must be credited to an account in name of ABC Corporation—NO EXCEPTIONS!

(Plaintiff's Exhibit 11.) [10] National Permanent's two witnesses on the subject of savings and loan practices, Heitmuller and Brown, testified to the existence of similar policies at their respective institutions.[11] Although both men indicated that tellers do not normally verify account ownership when they have become familiar with and recognize the customer, they also testified that it was not considered sound practice to accept for deposit into the account of a third party (an individual) a check which is made payable to a corporation.

The trial court's Conclusion of Law No. 7, *supra* at 11–12, is clearly erroneous because it is contrary to the evidence and because the reasoning is not sound. The evidence failed to establish that National Permanent's employees had reason to know that AMTDA is a corporation. However, neither this nor the fact that National

---

**9.** National Permanent's teller's manual also has a relevant provision restricting teller conduct which states: "Checks payable to Corporations ... MUST always be deposited to an account in the name of the corporation and NEVER to an account in the name of an individual(s)." *See* Plaintiff's Exhibit 23.

**10.** This memo to National Permanent employees was issued in March 1978 by National Permanent's senior vice president, Millner, in an attempt "to prevent any further misunderstanding and confusion." However, Millner testified that these policies were in effect during the relevant period involved herein.

**11.** These two witnesses were not qualified as experts and thus, testified on the policies and practices within their own institutions only, Heitmuller on Interstate Federal Savings and Loan and Brown on Columbia Federal Savings and Loan. However, their testimony in this vein is probative of what are "reasonable commercial standards" in the industry. *See* note 4 *supra.*

Permanent tellers may have "thought" Budlong and AMTDA were one in the same justify National Permanent's conduct. *Continental Bank v. Wa-Ho Truck Brokerage, supra,* 595 P.2d at 212; *Gresham State Bank v. O & K Construction Co., supra,* 370 P.2d at 733; *Seattle-First National Bank v. Pacific National Bank, supra,* 587 P.2d at 625. Further, although it is generally true that reasonable commercial standards permit acceptance for deposit checks endorsed by a rubber stamp, this practice was not shown to be reasonable under the facts of this case. *See Perley v. Glastonbury Bank & Trust Co., supra,* 368 A.2d at 155 and *First National Bank v. Hovey, supra,* 412 N.E.2d at 894–95 which hold that even though a practice is shown to be common in an industry, it must still be shown to be reasonable.[12] The fact remains that checks made payable to a corporation, AMTDA, were accepted for deposit into the account of an individual, one who was not the named payee of the checks.

Based on all the foregoing, we hold that as a matter of law, National Permanent's conduct did not comport with the reasonable commercial standards of its business. We, therefore, reverse and remand for a determination of the amount of damages and order that judgment be entered for AMTDA against National Permanent in the amount commensurate with its liability for conversion.[13]

*So ordered.*

12. In *Empire Moving & Warehouse Corp. v. Hyde Park Bank & Trust Co., supra,* 357 N.E.2d at 1201–02, the Appellate Court of Illinois held that use of a rubber stamp endorsement did not create the appearance of authority in Empire's bookkeeper to cash checks made payable to Empire. Further it was noted that banking practices indicated checks made payable to a corporation should not be cashed but should be accepted for deposit only to the account of the named payee. As was the case there, here, checks were accepted for deposit in Budlong's account, and not in the account of the named payee, AMTDA. AMTDA had no account at National Permanent.

13. We note that the measure of liability for conversion of an instrument is covered by D.C. Code § 28:3–419(2) and (3) (1981).