C. C. BOGGS, Appellee, v. DUNCAN-SCHELL FURNITURE CO., and H. C. DUNCAN, Appellants.

**Torts:** DOING OF LAWFUL ACTS: IMPROPER MOTIVE. It is the general
1   rule that whatever one has a lawful right to do he may do in a lawful way, and the fact that he was prompted by malice in doing the act will not change the rule or render him liable for the act.

**Same:** UNLAWFUL COMPETITION: EVIDENCE. One is entitled to pursue
2   his business for his own pleasure and profit; but he has no right to maliciously injure another in his lawful business by engaging in a simulated competition not for profit, but for the sole purpose of doing injury to a competitor. Evidence held to show that defendant's competition was a mere simulation influenced by a malicious intent to ruin plaintiff in his business, without profit to defendant and was an actionable wrong.

*Appeal from Lee District Court.*—HON. H. BANK, JR., Judge.

THURSDAY, OCTOBER 23, 1913.

ACTION to recover damages for injury claimed to busi-

ness. It appears that plaintiff was a sewing machine agent and defendant a retail merchant in the same city, and defendant, for the purpose of injuring plaintiff in his business, wrongfully and maliciously advertised to the public it would sell the same machine handled by the plaintiff at half the price for which the plaintiff was offering them for sale; that the sole purpose of the defendant in so doing was to ruin plaintiff in his business. Cause tried to a jury. Verdict and judgment for the plaintiff. Defendants appeal.—*Affirmed.*

*W. J. Roberts* and *D. F. Miller*, for appellants.

*Hughes & McCoid*, for appellee.

GAYNOR, J.—Plaintiff claims that on the 1st day of February, 1910, he was the exclusive agent for the sale of the New Improved White sewing machine in Lee county and adjoining counties; that the defendant Duncan-Schell Furniture Company, prior to that time, had been selling the same machines for profit, or as agents for the said sewing machine company; that, after plaintiff had secured the sole and exclusive agency for said machine, and while he was selling the same as agent, the defendants, for the purpose of destroying plaintiff's business, and breaking him up financially, and putting him out of business, maliciously and willfully procured various old styles of said White sewing machine, and advertised the same at a price of $24.75, and published that they were selling the latest improved drop head White sewing machine for that price, the same kind of machine which the plaintiff was handling, and was selling for $45; that the selling price of the sewing machines, and the price at which the defendants sold the machine during the time the defendant company was the agent, was $45; that defendants further advertised and published that they had just received new White sewing machines, both rotary and vibrator, which they would sell at $24.75; that they did not have any such

machines, and the statement that they had just received them was untrue; that the defendants had not received, at any time, any new White sewing machines of the rotary type; that they further falsely said that the machines just received by them were of the latest pattern of said machine. The usual market price of the latest improved White sewing machine was $45, and that the defendants knew this at the time. Plaintiff says all the foregoing acts were committed by the defendants willfully and maliciously, and for the sole purpose of driving the plaintiff out of business in the sale of his machines, and for the purpose of falsely putting the plaintiff in the light of a dishonest dealer, and unworthy of patronage, in that he was attempting to sell a $25 machine for $45. Defendants' answer to plaintiff's claim is a general denial. Upon the issues thus tendered, the cause was tried to a jury, and verdict and judgment for the plaintiff.

It appears from the evidence that the defendant Duncan inserted in one of the daily papers issued in Keokuk on or about March 2d the following:

Duncan-Schell Furniture Co. March Sale Special.
[Followed by a cut of a White Sewing Machine.]
Automatic Drop Lift White Sewing Machine, both Vibratory and Rotary, Latest Pattern................$24.75
(And again:)
March Sale Prices on Sewing Machines.
More White Sewing Machines just received. March sale price on White Sewing Machines, the latest patterns, both Vibratory and Rotary....................$24.75
(Again:)
March Sale on Special Sewing Machines.
[With cut of White Machine in advertisement.]
More White Sewing Machines just received.
March Sale Special.
White Sewing Machines in latest patterns, both vibratory and rotary...............................$24.75
(Again, with the same heading:)
The March Sale of Drop Head White Sewing Machines of the latest pattern..........................$25.00
(Again, with the same caption:)

$25.00 buys the latest improved 6 Drawer Top Head White Sewing Machine, with Automatic Lift and best set of attachments.

(Again, the same caption, with cut of White Sewing Machine:)

The best machine at any price.................$25.00

Your money back in 365 days if you are not convinced you have the best on earth. White Sewing Machine with White Sewing Machine Co.'s guarantee.....$25.00

(Then in September appeared the following advertisement:)

Duncan-Schell Furniture Co.'s Annual September Sale.

$25.00 buys the latest improved 6 Drawer Drop Head White Sewing Machine, with Automatic Lift and best set of attachments.

Then follows practically the same advertisement that appeared in March.

It appears that, at the time these advertisements were made, the plaintiff was the sole and exclusive agent for the sale of the machines so advertised by the defendants. The plaintiff testifies that on or about the 1st of February the defendant Duncan called him into his store, and said: "Boggs, I understand that you are going to take the agency for the White sewing machine. You know you have no money, and you cannot get the machines, and, if you do get them, I will run you out of business with the same machine." One Leach, who was the state agent in Iowa for the White sewing machines, testified: "At the time I talked with Duncan, before we changed agents, he talked considerably about Boggs. He told me that, if we gave the agency to Boggs, he could not run, because he had no money, and they would run him out of business in less than six months. This conversation was about the 1st of February."

The plaintiff further testified that, after these advertisements came out in March, stating that the defendants had received another shipment of machines to be sold at $24.75, he went to Mr. Duncan, and asked him if he had any new machines, and he said he had second-hand ones. "Then, turning

to me, he said: 'Boggs, have we starved you out yet? If you are not starved out yet, we will soon see that you are starved out.' He said he had a right to put in the advertisements in the paper because he had old machines that he wanted to sell.'' Leach further testified that Duncan and the Duncan-Schell Furniture Company did not buy any White sewing machines of the White Sewing Machine Company during 1910, or any time since that; that in September or October, after these advertisements were put out by the defendants, he went to the defendants to buy these sewing machines they had on hand. "I told him I came in to buy the White sewing machines he had, and he said he didn't want to sell them. I told him that they were advertising them, and that what they were doing was hurting Mr. Boggs and the White Sewing Machine Company, and I wanted to buy them. Duncan said he would not sell them. I told him I came to buy them at his price, and he said he did not want to sell them at all; that he wanted to keep them as souvenirs. When I told him that he was hurting Boggs by his advertisements, he said he didn't care for that. He advertised as he pleased.'' These conversations alleged to have been had with Duncan, were all denied by Duncan. This left it a question of fact for the jury to determine.

It appears from the evidence that, at the time Boggs took this agency for the White Sewing Machine Company, the defendants were engaged in a general mercantile business, handling sewing machines, carpets, rugs, furniture, stoves, washing machines, and other like articles; that they handled four makes of sewing machines, the New Home, Standard, the Duncan-Schell Special, and the White; that the exclusive agency for the White was given by the White Sewing Machine Company from and after the 1st of February to the plaintiff, Boggs.

It appears that the Duncan-Schell Furniture Company, prior to the time Boggs became the sole agent, had handled these White sewing machines, and sold them at retail, and

had done so for a number of years; that Boggs was in the service of the defendant company as its agent in disposing of those machines; that, at the time Boggs quit, the company had twelve White machines on hand, eight in its Keokuk store, and four in its Carthage store; the latter were brought to Keokuk in March, 1910; that they had bought these machines outright from the White Sewing Machine Company. There is evidence that these machines were not the latest improved pattern of the White machine, and did not have the latest improvements, and did not have the attachments advertised; that they had not just received them, as stated in the advertisement, and that they were not furnished with the improvements advertised; that the machines handled by the plaintiff were of that character and kind, and had the latest improvements.

So it is apparent that, upon the issues tendered by the plaintiff, there was evidence upon which the jury might well find all the material facts, upon which plaintiff bases his right to recover, established, both as to what the defendants did, and as to the motive by which they were actuated in the doing. We do not understand that the defendants seriously questioned this, but contend that, conceding the facts to be established as alleged, and as established by the evidence, still the plaintiff has no right to recover: (1) Because the defendants had an absolute right to publish advertisements complained of, and their motive in so doing cannot be questioned. (2) That, inasmuch as the advertisements complained of made no attack upon the plaintiff, or upon the machines kept for sale by the plaintiff, no legal right of Boggs was assailed by the defendants, and whether they thought good or ill of him when they published these articles is immaterial. (3) That public policy forbids that the motive of an established trader, in publishing a legal advertisement of his own wares, shall be inquired into or questioned.

Defendants' contention resolves itself into the proposition that malicious motives in the doing of an act may make

the act worse, where the act is wrongful or unlawful, yet it cannot make that wrong or unlawful which is, in itself not unlawful or wrongful; or, in other words, that an action cannot be predicated upon the doing of an act which does not, in itself, amount to a legal wrong, because the party doing the act was moved to it by a wicked or malevolent heart. Therefore the defendant contends that, as it had in its possession certain White sewing machines, and had the same for sale, the fact that they wrongfully or purposely deceived the public as to the character or the quality of the articles for sale would not entitle one engaged in the same business to complain, though the defendant, in the doing of the act, had the purpose and intent to injure his competitor, and was, in fact, actuated by malice towards his competitor, and though the competitor lost his business by reason of the defendant's conduct.

This would seem like a simple proposition, and, abstractly considered, would appeal to any mind, possessing legal acumen, as sound. No one could seriously question the proposition that, if one does that only which he has 1. TORTS: doing of lawful acts: improper motive. a right to do under the law, and does it in a legal way, he ought not to be called to account for his conduct, no matter what his motive might be, and there are many authorities to support the abstract proposition that a lawful act cannot be made the foundation of an action, because it was done with an evil motive, and some cases have held that the motive with which an act is done is not an element of a civil wrong. It may go to enhance the damages, but is not an element of the wrong itself.

In *Guethler v. Altman,* 26 Ind. App. 587 (60 N. E. 355, 84 Am. St. Rep. 313), an action in which a merchant sought to recover damages of the members of the school board and a teacher in the school, on the ground that they had willfully and maliciously prevented their students, by threats and intimidations, from trading at plaintiff's store, alleging that they had talked to the pupils, advising them to stay away

from plaintiff's place of business, and to purchase their supplies elsewhere, and threatening that, if they did not do so, they would be suspended, and that, as a result of the wrongful act of the defendants, plaintiff was injured in his business, plaintiff alleged that, when high school pupils started to enter his store, they would discover they were being watched by the defendant, Crull, and they would turn away and not enter; that Crull wrote letters to the parents of the pupils containing threats that, if the pupils visited plaintiff's store, they would be suspended, and that it was all done with the systematic purpose and intent of injuring plaintiff in his business; that Crull was following the instructions of the other defendants in what he did; and that plaintiff was thereby injured in his business. The case was disposed of on demurrer. In the opinion delivered by the Supreme Court, it says: "It was not an unlawful act for Crull to advise or persuade the pupils not to visit appellant's store. The fact that he acted maliciously does not change the rule. The act which is not unlawful in itself, and which violates no right, cannot be made actionable because of the motive which induced it. A malicious motive will not make that wrong which, in its own essence, is lawful," and cites, in support of that rule, *Chatfield v. Wilson*, 28 Vt. 49; *Jenkins v. Fowler*, 24 Pa. 308; *Frazier v. Brown*, 12 Ohio St. 294; *Phelps v. Nowlen*, 72 N. Y. 39 (28 Am. Rep. 93); Cooley on Torts (2d Ed.) 832; *Boyson v. Thorn*, 98 Cal. 578 (33 Pac. 492, 21 L. R. A. 233). Many other cases might be cited in support of this abstract proposition.

These cases present, as strongly as any, the application of the abstract rule contended for by appellant. They present the general rule to concrete cases that, what a man has a lawful right to do, he may do, no matter what his motive may be, no matter what injuries may result from it, and yet not be called to answer for his conduct.

It is not so difficult to know what the law is as to know what is a just and fair and right application of the law to a

given state of facts. As civilization advances, and the social
and business conditions become more involved
and complicated, when even legitimate com-
petition has become so strong that even honest
men are tempted to force their way beyond the limits of legiti-
mate competition, the law—which is a rule of civil conduct for
the government of men in their social and business relation-
ships—ought to keep pace with the new conditions. The in-
tegrity of the social order, the stability of business itself, re-
quires, and the law should require, that every man conduct
himself in full recognition of the fact that he is a member
of that social order; that he not only has rights, but has cor-
responding duties; and that the performance of those duties is
as binding upon him as a member of the social order as are
the rights given to him. Men, as members of organized so-
ciety, under the law, have the right to do certain things; but
that right is restricted and limited by the duty imposed upon
them not to exercise those rights wantonly and willfully to the
injury of another. In the exercise of the law-given right, the
well-being of the social order requires that each person should
exercise his right consistently with the fact that he is a mem-
ber of the social order out of which his rights grew. While
a person has the right to pursue his avocations and his busi-
ness for his own pleasure and profit, he has no right, directly
or indirectly, to willfully and maliciously injure another in his
lawful business or occupation. Men have the right to engage
in lawful competition, and, though the competition may have
the effect of driving another out of business, if the competi-
tion is lawful, no action arises, though injury resulted from
the competition. Where there is lawful competition for gain,
for supremacy in business, for the legitimate control of busi-
ness, even though the purpose and effect of the competition
is to drive from business competitors, yet, if the competition
is lawful and carried on in a lawful way, no action will lie.
There is a difference between lawful competition and simu-
lated competition carried on with the sole purpose and intent,

2. SAME: unlaw-
ful competi-
tion: evidence.

not of profit and gain, but of maliciously injuring others engaged in that particular business.

The case before us does not present a case of lawful competition, but a case of simulated or pretended competition, designed and carried out with malice for the purpose of injury to the plaintiff in his business. At least the jury might have so found from the evidence.

It is the purpose and intent of the law to deal with things as they are and not as they seem, "Seems, Madam. No; it is. I know not seems."

Every man has the legal right to advance himself before his fellows, and to build up his own business enterprises, and to use all lawful means to that end, although in the path of his impetuous movements he leaves strewn the victims of his greater industry, energy, skill, prowess, or foresight. But the law will not permit him to wear the garb of honor only to destroy. The law will not permit him to masquerade in the guise of honest competition solely for the purpose of injuring his neighbor. The law will not permit him to simulate that which is right for the sole purpose of protecting himself in the doing of that which is palpably wrong.

It is said that a man cannot be called to answer for doing that which he has a right to do, no matter what the effect of the doing may have upon others, and no evil motive can make an act wrong, the doing of which is within the rights granted by law. But the question still stands, Is he within his legal right when he simulates honest competition, not to advance himself or his own interests, but for the sole purpose of inflicting injury upon his neighbors? It is said the law deals only with externals; but the law ought not to be blinded by the lion's skin. It may be that expressed malice in the doing does not, of itself, make the wrong; but malice is implied in the very act of doing, and therefore the act itself is wrong.

In *Tuttle v. Buck*, 107 Minn. 145 (119 N. W. 946, 22 L. R. A. (N. S.) 599, 131 Am. St. Rep. 446, 16 Ann. Cas. 807), we find this language: "When a man starts an opposition

place of business, not for the sake of profit to himself, but regardless of loss to himself, and for the sole purpose of driving his competitor out of business, and with the intention of himself retiring upon the accomplishment of his malevolent purpose, he is guilty of a wanton wrong and an actionable tort. In such case he would not be exercising his legal right, or doing an act which can be judged separately from the motive which actuated him. To call such conduct competition is a perversion of terms. It is simply the application of force without legal justification, which in its moral quality may be no better than highway robbery.''

In *Doremus v. Hennessy,* reported in 176 Ill. 608 (52 N. E. 924, 54 N. E. 524, 23 L. R. A. 797, 802, 68 Am. St. Rep. 203), the Supreme Court of Illinois, after recognizing the rule of lawful competition, carried on in a lawful way, says: ''An intent to do a wrongful harm and injury is unlawful, and, if a wrongful act is done, to the detriment and the right of another, it is malicious, and an act maliciously done, with the intent and purpose of injuring another, is not lawful competition.''

This court recognizes that: ''Every man has a' right, under the law, as between himself and others, to full freedom in disposing of his own labor or capital according to his own will, and anyone who invades that right without lawful cause or justification commits a legal wrong, and, if followed by an injury caused in consequence thereof, the one whose right is thus invaded has a legal ground of action for such wrong.''

The same doctrine is recognized in *Panton v. Holland,* reported in 17 Johns. (N. Y.) 92 (8 Am. Dec. 369), and in *Van Horn v. Van Horn,* 52 N. J. Law, 284 (20 Atl. 485, 10 L. R. A. 184), and finally, in *Dunshee v. Standard Oil Co.,* 152 Iowa, 618. In this case the question here under consideration is fully discussed, and the authorities collated. It presents fully and fairly the features which distinguish honest competition, for personal gain or advancement, from pretended competi-

tion, for the sole purpose of injuring another, and we think the doctrine therein expressed, and the law as therein exemplified, meets all the conditions of the case at bar.

Other questions are discussed by counsel; but they are all crystallized in the question herein discussed.

We find no error in the record, and the case is *Affirmed*.

WEAVER, C. J., and DEEMER, and WITHROW, JJ., concur.