FARMERS COOPERATIVE ELEVATOR,
INC., DUNCOMBE, Iowa, Appellant,

v.

The STATE BANK, Appellee.

No. 2–57117.

Supreme Court of Iowa.

Dec. 17, 1975.

Johnson, Burnquist, Erb, Latham & Gibb, Fort Dodge, for appellant.

McCarville, Bennett, Beisser, Ferguson & Wilke, Fort Dodge, for appellee.

Heard by MOORE, C. J., and MASON, RAWLINGS, UHLENHOPP and HARRIS, JJ.

UHLENHOPP, Justice.

This appeal turns on the sufficiency of the evidence to generate fact issues on wrongful dishonor of checks and tortious interference with prospective business advantage.

Farmers Cooperative Elevator of Duncombe, Iowa, sought compensatory and punitive damages from The State Bank of Fort Dodge, Iowa, for wrongful dishonor of checks drawn by the Elevator on its account with the Bank, see § 554.4402 of the Uniform Commercial Code, and for tortious interference by the Bank with the Elevator's prospective business advantage. See Restatement, Torts 2d, § 766A (Tent.Draft 14). A jury awarded the Elevator compensatory and punitive damages on both claims. On the Bank's motion, the trial court granted the Bank judgment notwithstanding the verdict. The Elevator appealed.

The Elevator had been doing business with the Bank for many years prior to June and July 1971, when the Bank took the action for which the Elevator seeks damages. In late June 1971, the Bank held six of the Elevator's notes with unpaid balances totaling approximately $272,000. Of this amount, $190,000 was evidenced by four short-term notes and the balance by two long-term notes. The Elevator's indebtedness was secured by mortgages and security agreements. The Bank's legal limit of lending to a customer was $300,000.

On June 28, 1971, representatives of the Elevator and the Bank met to discuss the Bank's financing of the Elevator; the Elevator apparently wished to convert some of its short-term debt to long-term. The Elevator also indicated it lost $22,000 in the fiscal year which ended May 31, 1971, it was short of cash, it had drawn checks on its account with the Bank for $35,000 more than the account would cover, and it needed some $50,000 additional operating funds within a couple weeks. The Bank declined to increase the amount of the long-term loan but suggested that the Elevator seek long-term financing from the Bank for Cooperatives in Omaha, Nebraska. The Elevator followed this suggestion, but in a July 1 meeting the Bank for Cooperatives also declined to undertake the Elevator's long-term financing.

On Friday, July 2, 1971, several of the Elevator's officers and directors again met with the Bank's representatives. The group discussed various methods of meeting the Elevator's financial needs. During the discussion, the Bank's executive vice-president, Richard Smith, came to the view that the Elevator had substantially less company-owned grain on hand than he had previously been led to believe. Since this grain was considered the primary security for the loans to the Elevator and particularly for the short-term loans amounting to $190,000, Smith became quite concerned. When he asked that the Bank be given warehouse receipts on the company-owned grain, the Elevator's manager agreed to give them; the evidence shows that in most cases banks lending to elevators take warehouse receipts as security. The meeting then ended.

On the evening of the same day, Smith went to the Elevator and received the warehouse receipts on the company-owned grain. That grain was worth $130,000. The manager's wife told Smith at the time that she and the manager were concerned about the manager's possible personal liability arising from the Elevator's problems and that they had contacted their attorney for advice. Also at that time the manager handed Smith two sight drafts totaling $9000, which the Bank ultimately applied on the Elevator's notes.

The Elevator's board met on the night of July 2 and voted to close the Elevator through July 6, the following Tuesday; the Elevator's corporate minutes state this closing was "for the holiday and finances." The Bank learned that the Elevator was closed.

After the July 2 meeting between representatives of the Bank and the Elevator, the Bank's president sent a letter to the Elevator's president saying that unless a better financial picture was presented to the Bank by Tuesday, July 6, the Bank would return the Elevator's outstanding checks and apply the balance in the Elevator's checking account, then some $71,000, against the Elevator's notes. The payment dates on the Bank's notes had not yet then arrived.

About 8:00 a. m. on July 6, Bank officers visited the Elevator. They found no activity and saw a sign, "Closed until Tuesday, July 6."

Before noon that same day, the Bank's officers, whom the Elevator had not yet contacted, decided to set off the Elevator's checking account balance against its notes. As a result of the setoff, checks for some $64,000 drawn on the Elevator's account were returned to the payees marked "Not Sufficient Funds". Also on July 6, Richard Smith of the Bank telephoned the Iowa Commerce Commission in Des Moines and told the Commission that the Elevator was in financial difficulty. A Commission official who was a witness for the Elevator testified that the Commission encourages such calls. Later that afternoon, the Elevator's president telephoned Smith and scheduled a meeting the next day between representatives of the Bank and the Elevator. Smith did not tell the Elevator's president about the decision to set off or the call to the Commerce Commission.

On July 7, the Elevator's representatives met with the Bank's officers once again. The parties discussed possible ways for the Elevator to work out its problems. They talked about a proposed merger of the Elevator with another elevator, but that would take time. The Bank refused to extend further credit to the Elevator, noting it could legally lend the Elevator a total of only $300,000 so that any additional amount it could lend at that time would be of little help. At the end of the meeting, Smith handed the Elevator's president a letter notifying the Elevator of the setoff exercised by the Bank the day before.

Shortly after this meeting ended, Smith went to the Elevator where its manager handed him drafts totaling $11,128.17. Smith deposited this sum in the Elevator's account and set it off against the Elevator's notes.

In response to the Bank's call, the Commerce Commission sent two inspectors to the Elevator. The inspectors initially found substantially less grain in the Elevator than the amount of the Elevator's outstanding warehouse receipts—a shortage of some 9600 bushels of corn and 1350 bushels of soybeans. Upon a later and more thorough measurement, however, the Commerce Commission found that there was only a very small grain shortage.

On July 12, representatives of the Commerce Commission, the Bank, and the Elevator's bonding company held a meeting at the Commission's offices. The Commission's chairman suggested that the Bank return to the Elevator some of the warehouse receipts which the Bank had received on July 2; cancellation of those receipts would cause the Elevator again to have sufficient grain to cover outstanding warehouse receipts. The bank refused to do so.

On July 13, 1971, the Commission issued an order suspending the Elevator's license to warehouse grain, stating as grounds the shortage of grain, failure to keep adequate records as required by § 543.35 of the Code, and violation of Commission Rule W–12 by cancellation of warehouse receipts before the commodity represented by the receipts was removed from storage (1966 I.D.R. 109).

During the next several weeks, Bank and Elevator representatives met several times to negotiate new financing for the Elevator. They failed to reach agreement. On August 18, 1971, the Elevator obtained financing from the Union Trust & Savings Bank of Fort Dodge; the new loans allowed the Elevator to pay off the balances on its notes held by The State Bank. The Elevator's license to warehouse grain was reinstated by the Commerce Commission on August 24, 1971, the Commission finding that the grain shortage had been eliminated, the Elevator's bookkeeping and operating procedures modified, and its financial condition improved.

On October 27, 1971, the Elevator brought this action against the Bank for wrongful dishonor and tortious interference. In the consideration of specific issues we will recite additional relevant evidence.

I. *Wrongful Setoff.* As its first ground for reversal, the Elevator claims the trial court erred in granting judgment notwithstanding the verdict on the claim of wrongful dishonor. The Bank caused dishonor of the Elevator's checks by setting off the Elevator's checking account against its notes. The fighting issue here is whether the setoff was wrongful; if it was, obviously the Bank's dishonor was wrongful.

In defending its exercise of setoff, the Bank asserts three separate justifications: the Bank could declare the notes due and set off the Elevator's deposit against them (1) because of an acceleration clause in the security agreements, (2) because of setoff clauses in the notes, and (3) because of the Elevator's insolvency. The Bank also asserts three additional defenses: waiver, estoppel, and ratification.

■ A bank may set off a general deposit against a depositor's matured debt. *Porter Auto Co. v. First National Bank,* 185 Iowa 844, 846, 171 N.W. 121, 122; 5A Michie, Banks and Banking (1973) § 115b at 307; 9 C.J.S. Banks and Banking § 296 at 614–615. The due dates on the Elevator's notes, however, had not arrived on July 6,

1971. The Bank therefore relies on the acceleration and setoff clauses which we have mentioned and also on the Elevator's insolvency. We will first consider the acceleration clause.

The Elevator entered intò a security agreement on July 22, 1970, to secure any debts of the Elevator to the bank "now existing or hereafter arising." The agreement stated that on default, the Bank could declare all of the Elevator's debts to it due and payable. The Bank contends that the Elevator defaulted within the terms of this agreement, giving the Bank a right to accelerate all of the notes, which it did, and that the notes were therefore mature at the time of setoff.

Under the agreement, any of several events constitutes default. Section 12(j) of the agreement makes the following event a default: "The Secured Party deems itself insecure for any reason whatsoever."

Section 12(j) comes within § 554.1208 of the Uniform Commercial Code:

A term providing that one party or his successor in interest may accelerate payment or performance or require collateral or additional collateral "at will" or "when he deems himself insecure" or in words of similar import shall be construed to mean that he shall have power to do so only if he in good faith believes that the prospect of payment or performance is impaired. The burden of establishing lack of good faith is on the party against whom the power has been exercised.

■ The record leaves no doubt that the Bank believed itself insecure. The issue is whether the Bank was in good faith in its belief. Since § 554.1208 places the burden on the Elevator, the issue more specifically is whether the Elevator adduced proof that the Bank was *not* in good faith. The Elevator had to introduce substantial evidence of lack of good faith; a mere scintilla would not suffice. *Peterson v. Farmers Cas. Co.,* 226 N.W.2d 226, 232 (Iowa).

Section 554.1201(19) of the Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." The Elevator argues however that the good faith required by § 554.1208 requires not only honesty in fact but also a *reasonable* belief in impairment of the prospect of payment.

■ We cannot agree. Where the Uniform Commercial Code requires for good faith more than "honesty in fact" it explicitly so states. §§ 554.2103(1)(b), 554.3406, 554.7404, 554.8318. Decisions construing § 1201(19) of the Code overwhelmingly agree that the test of good faith under that section is a wholly subjective one of honesty. Cases so holding under § 1201(19) as applied to various parts of the Commercial Code include *Bowling Green, Inc. v. State Street Bank & Trust Co.*, 425 F.2d 81 (1 Cir.); *Third National Bank v. Hardi-Gardens Supply of Illinois, Inc.*, 380 F.Supp. 930 (M.D.Tenn.); *Sherrock v. Commercial Credit Corp.*, 290 A.2d 648 (Del.); *Industrial National Bank v. Leo's Used Car Exchange, Inc.*, 291 N.E.2d 603 (Mass.); *Eldon's Super Fresh Stores, Inc. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 296 Minn. 130, 207 N.W.2d 282; *Balon v. Cadillac Automobile Co.*, 113 N.H. 108, 303 A.2d 194; *General Investment Corp. v. Angelini*, 58 N.J. 396, 278 A.2d 193; *McConnico v. Third National Bank*, 499 S.W.2d 874 (Tenn.); *First State Bank & Trust Co. v. George*, 519 S.W.2d 198 (Tex.Civ.App.); *Richardson Co. v. First National Bank*, 504 S.W.2d 812 (Tex.Civ.App.); *Riley v. First State Bank*, 469 S.W.2d 812 (Tex.Civ.App.); *Von Gohren v. Pacific National Bank*, 8 Wash.App. 245, 505 P.2d 467. See also Comment, 28 Md.L.Rev. 145, 153 (1968). Cases so holding under § 1201(19) as applied to an accelerating creditor specifically include *Van Horn v. Van De Wol, Inc.*, 6 Wash.App. 959, 497 P.2d 252; *Ft. Knox National Bank v. Gustafson*, 385 S.W.2d 196 (Ky.).

■ We are unable to find substantial evidence in the record that in accelerating the notes the Bank was not honestly concerned with the security of its loans. On the contrary, the record contains considerable indisputable evidence of circumstances known to the Bank which would cause a lender concern. The Elevator owed the Bank $272,000. At the June 28 meeting, the Elevator's representatives said the Elevator had more checks outstanding than its balance. They also said they needed $50,000 within the next two weeks. The small amount of company-owned grain on hand reported by the Elevator manager surprised and dismayed the Bank officers. The Bank knew that the Elevator had a loss of $22,000 in the fiscal year just completed. On the evening of July 2, the Bank's Richard Smith saw the Elevator manager and the latter's wife at the Elevator; the wife said they had contacted an attorney to determine whether the manager might have personal liability arising from the Elevator's situation. The Elevator closed for two business days—Saturday, July 3, and Tuesday, July 6.

The Elevator has not adduced substantial proof that the Bank's concern about the security of its loans, whether or not reasonable, was not genuine or that the Bank had an ulterior motive. We conclude the trial court properly held the Elevator did not generate a fact issue that the Bank was not in good faith in its belief. Since the Elevator has not shown the acceleration was improper, the Bank could properly set the notes off against the Elevator's checking account balance. Thus the resultant dishonor of the Elevator's checks was not wrongful. The trial court properly granted judgment notwithstanding the verdict on this claim.

This conclusion renders consideration unnecessary of the Bank's contention that it could in any event set the Elevator's deposit off against the notes under a clause in each note stating, "The State Bank is hereby authorized to apply at any time any credit balance due from said bank to the makers or endorsers of this note upon the same." Neither need we consider the Bank's contentions relating to insolvency, waiver, estoppel, or ratification.

II. *Tortious Interference.* As a second cause of action, the Elevator asserts that the Bank tortiously interfered with its prospective business advantage in exercising the setoff, receiving and refusing to release the warehouse receipts on the company-owned grain, and informing the Commerce Commission that the Elevator was having financial problems. The Bank urges several defenses to this claim.

■ The Elevator does not assert interference with existing contracts but rather with prospective business advantage. It claims the Bank caused the Elevator to be closed, to lose customers' good will, and to suffer loss of profits it otherwise would have earned. While the acts relied on in cases which find tortious interference with prospective advantage are usually directed at third persons—causing them not to enter into transactions with the plaintiff—we see no reason why the result should be different when the acts are directed at the plaintiff itself, provided of course the other elements of a cause of action are present. Cf. Restatement, Torts 2d, § 766(2) (Tent.Draft 14).

■ Interference with prospective business advantage is a recognized tort in Iowa. *Clark v. Figge,* 181 N.W.2d 211 (Iowa). See Restatement, Torts 2d, § 766A (Tent.Draft 14). In *Clark* we dealt with the applicable statute of limitations in such cases and had no occasion to enumerate the essential elements of the tort. The present case requires us to take another step in this field—relating to the actor's purpose in interfering.

■ The role of the actor's purpose is considerably different in cases involving loss of existing contracts than in cases involving loss of prospective advantage. In cases of interference with existing contracts, a purpose to injure or destroy is not essential. Restatement, Torts 2d, § 766, Comment *h* (Tent.Draft 14); id. Reporter's Note, pp. 30–35. The situation is different in cases involving interference with prospective advantage. This is plain from the two earlier decisions which underlay *Clark v. Figge.* The actor's purpose to injure and destroy is evident from the following recitation in *Dunshee v. Standard Oil Co.,* 152 Iowa 618, 620–621, 132 N.W. 371, 372–373 (second appeal, 165 Iowa 625, 146 N.W. 830):

For present purposes it is enough to say that the case as made by the plaintiff tends strongly to show that defendant installed its scheme of retail distribution of oil in the city of Des Moines not for the purpose of establishing a retail trade, but as a mere temporary expedient to drive out the Crystal Company, and that, this being accomplished and having the field to itself, it withdrew its wagons and drivers, and gave its whole attention to its wholesale business. In the prosecution of its business, the Crystal Company was accustomed to supply its customers with cards to be displayed from a window or other conspicuous place, indicating a desire to purchase oil and inviting the distributor to stop and furnish the needed supply. The evidence further tends to show that when the Standard entered the field its drivers were directed to give special attention to the Crystal Company's "green cards," and that, at the outset at least, there was little or no attempt to build up a retail trade with the public generally, but to take away or destroy the trade of the Crystal Company. Some of the witnesses say the Standard's drivers would make it a point to get in advance of the Crystal's wagons, and wherever a green card was displayed would stop and make the sale if possible, sometimes permitting the buyer to suppose that he or she was dealing with a Crystal agent, and in other cases appropriating or carrying away the Crystal's cards. The Standard's hand in these efforts was not disclosed to the public. The drivers were instructed to do business ostensibly as independent dealers driving their own wagons, none of which were marked with the Standard's name, though in fact the

outfits were furnished and all expenses paid by it, and the entire business was carried on under the secret management of its agent, who held frequent meetings with the drivers, urging them to "go after the green cards," to "hustle the green cards," to "go after the Crystal Oil Company," and at the same time cautioned them to "keep quiet" about the real ownership and management. It is further testified that when the Crystal Company had been eliminated the manager in charge had a final meeting of the drivers at his residence, where he said, "The fight is over and we have bought them out." Plaintiff also shows that defendants' movement in the matter followed closely upon the Crystal Company's exercise of its right to purchase part of its oil from another dealer, and its refusal to yield to the Standard's insistence that it wanted "all or none" of the Crystal's trade. In short, the record as a whole is sufficient to justify the inference that the real end sought to be accomplished was to bar or exclude from the retail trade one who would not give the Standard Company, as a wholesale dealer, its exclusive patronage.

The court made plain its reliance on Standard Oil's purpose to destroy Crystal Oil (152 Iowa at 626, 132 N.W. at 375):

If, however, there was no real purpose or desire to establish a competing business, but, under the guise or pretense of competition, to accomplish a malicious purpose to ruin the Crystal Company or drive it out of business, intending themselves to retire therefrom when their end had been secured, then they can claim no immunity under the rules of law which recognize and protect competition between dealers in the same line of business seeking in good faith the patronage of the same people.

The essential role of the actor's purpose to injure or destroy is also manifest in the other foundation case, *Boggs v. Duncan-Schell Furniture Co.,* 163 Iowa 106, 143 N.W. 482. The court found the evidence supported Boggs' allegations that

he was the exclusive agent for the sale of the New Improved White sewing machine in Lee county and adjoining counties; that the defendant Duncan-Schell Furniture Company, prior to that time, had been selling the same machines for profit, or as agents for the said sewing machine company; that, after plaintiff had secured the sole and exclusive agency for said machine, and while he was selling the same as agent, the defendants, for the purpose of destroying plaintiff's business, and breaking him up financially, and putting him out of business, maliciously and willfully procured various old styles of said White sewing machine, and advertised the same at a price of $24.75, and published that they were selling the latest improved drop head White sewing machine for that price, the same kind of machine which the plaintiff was handling, and was selling for $45; that the selling price of the sewing machines, and the price at which the defendants sold the machine during the time the defendant company was the agent, was $45; that defendants further advertised and published that they had just received new White sewing machines, both rotary and vibrator, which they would sell at $24.75; that they did not have any such machines, and the statement that they had just received them was untrue; that the defendants had not received, at any time, any new White sewing machines of the rotary type; that they further falsely said that the machines just received by them were of the latest pattern of said machine. The usual market price of the latest improved White sewing machine was $45, and that the defendants knew this at the time. Plaintiff says all the foregoing acts were committed by the defendants willfully and maliciously, and for the sole purpose of driving the plaintiff out of business in the sale of his machines, and for the purpose of falsely putting the plaintiff in the light of a

dishonest dealer, and unworthy of patronage, in that he was attempting to sell a $25 machine for $45. 163 Iowa at 107–108, 143 N.W. at 483.

The court stated regarding the purpose to injure or destroy:

> Every man has the legal right to advance himself before his fellows, and to build up his own business enterprises, and to use all lawful means to that end, although in the path of his impetuous movements he leaves strewn the victims of his greater industry, energy, skill, prowess, or foresight. But the law will not permit him to wear the garb of honor only to destroy. 163 Iowa at 115, 143 N.W. at 486.

In the *Clark* case itself, while we were dealing with limitations, we described Clark's allegations regarding Figge's purpose to injure and destroy:

> Plaintiff further says in substance that after he refused to extend the option, defendant, maliciously and for private motives, embarked upon a course of action to injure plaintiff and destroy the corporation. To this end defendant caused notes of $102,862 of plaintiff and the corporation to be called by the bank, $3,348 to be extracted from the checking account of plaintiff and the corporation for recourse contracts discounted at the bank, a payment to be refused on plaintiff's personal note and the balance of the note to be accelerated, all financed customers of the corporation to be circularized that their payments should be made directly to the bank, payment to be demanded by the bank on three other notes of the corporation, release of a mortgage to be refused (though tender was made) until attorney fees for collection were paid, the bank accounts of plaintiff and of the corporation to be closed, and the corporation's supply of merchandise from its wholesaler to be cut off. As a result, plaintiff and the corporation were forced to close, and plaintiff has been damaged

$200,000 and is entitled to $100,000 exemplary damages. 181 N.W.2d at 212.

Of course, in many cases the actor has the additional purpose of advancing his own interests. To give rise to a viable cause of action, however, the actor must have as at least one of his objects the purpose to injure or destroy the plaintiff. The American Law Institute deals with this point in § 766A of the Restatement of Torts 2d, Tentative Draft 14. After setting out the rule on interference with prospective advantage, the Institute states in Comment *d*:

> *Intent and purpose.* In order for the rule stated in this Section to apply, the defendant must not only have intended the interference, but must have acted in part at least for the purpose of accomplishing it. In this respect the rule here stated differs from that stated in § 766 as to intentional interference with existing contracts. Under that Section, as stated in its Comment *i,* it is enough that the defendant intends to interfere in the sense that he knows that it is substantially certain to follow from his conduct, even though he does not desire it, and it is no part of his purpose. Where the interference is merely with prospective contracts, not yet reduced to the form of a legal obligation, it is not enough, under the rule stated in this Section, that the defendant knows that the interference is certain to follow. He must have acted in part at least for the purpose of bringing it about. It need not, however, be his sole purpose, or even his primary one; and the fact that his primary objective was that of securing benefits for himself will not prevent a purpose also to cause harm to the plaintiff.

The Reporter says regarding this rule:

> "Purposely" appears to be called for here. There seem to be no cases even suggesting liability when the defendant acts for his own purposes, with knowledge that his conduct is certain to cause a third person to avoid prospective rela-

tions with the plaintiff. Tent.Draft 14, p. 50.

See also Prosser, Torts (4th ed.) § 130 at 953–954.

Turning to the present record, we may assume arguendo that the Elevator introduced proof of all of the other elements of a cause of action for tortious interference with prospective business advantage. The difficulty is that the Elevator did not introduce substantial evidence of a purpose on the part of the Bank to injure or destroy the Elevator. On the contrary, the evidence overwhelmingly shows that the Bank acted for its "own purposes." It was alarmed about its security and sought to protect its position. Far from desiring the destruction of the Elevator, the Bank would unquestionably have been delighted had the Elevator been able to get on its feet and operate profitably; the Elevator had been a valued customer for many years.

The undisputed evidence here presents an entirely different picture from the situations in *Dunshee, Boggs,* or *Clark.* The record contains no evidence, for example, that prior to these events the Elevator decided to switch its source of credit to another lender and that the Bank, upon learning of the switch, embarked upon a program to break the Elevator—comparable to the situation in *Dunshee v. Standard Oil Co.*

■ The Bank argues other defects in the Elevator's tortious interference claim, but we do not reach those contentions. We conclude that the Elevator must fail on this claim for want of substantial evidence that the Bank acted with a purpose to injure or to destroy the Elevator.

III. *Other Issues.* The parties present several other issues, but with the Elevator's two alleged bases of liability out of the lawsuit, its case against the Bank collapses. We thus hold that the trial court properly granted judgment for the Bank notwithstanding the verdict.

Affirmed.