**William TOLANDER, Appellant,**

v.

**FARMERS NATIONAL BANK, Appellee.**

No. 88–774.

Supreme Court of Iowa.

March 21, 1990.

Edward W. Dailey of Edward W. Dailey Law Offices, P.C., Burlington, for appellant.

Wm. Scott Power of Aspelmeier, Fisch, Power, Warner & Engberg, Burlington, for appellee.

Considered by HARRIS, P.J., and SCHULTZ, LAVORATO, SNELL, and ANDREASEN, JJ.

HARRIS, Justice.

This tort suit between a financially strapped farmer and a rural bank arises from a distressing factual setting with which, regrettably, we have become most familiar. The farmer brought this suit after his operation was closed out by a bank. By various tort theories he claimed he was damaged by the bank's improper actions. Following a bench trial the district court rejected all of plaintiff's claims. Although we strongly condemn aspects of the bank's conduct we are obliged to affirm.

Plaintiff, William Tolander, has been farming in the Olds, Iowa, area since approximately 1960. Until 1985 Tolander farmed 422 acres. This consisted of 122 acres he was buying from his father and 300 acres which he rented. He was primarily a crop farmer.

Tolander had been doing business with the defendant Farmers National Bank of Winfield, Iowa, since 1960. Not until 1983, however, did he begin dealing with the bank on a large scale when the bank agreed to loan Tolander up to $100,000. The loan was covered by a security agreement. During the nine-month period from September 1984 to May 1985 Tolander and the bank arranged the details. Tolander estimated his positive net worth to be $105,125. His projected cash flow for the 1984 crop year was $21,314. At this time the bank loaned Tolander a total of about $74,000.

In September of 1984 the bank was examined by state bank examiners. *See* Iowa Code § 524.217 (1989) (bank examinations). The examiners determined Tolander was "highly leveraged," meaning he had a small amount of equity supporting a large amount of debt. The examiners classified Tolander's line of credit as "substandard" and recommended that the bank "closely monitor this line and enforce reduction from grain and livestock sales to protect [the] present collateral position."

On November 26, 1984, Tolander opened a checking account at defendant bank and agreed to certain terms concerning application of his accounts to payments owed the bank. In this connection he signed a signature card which provided in part:

> Deposits, other than in cash, will be handled as follows. We are the Customer's agent as to all such deposits and are required only to act with due care as to them. We may give credit for such deposits when they are made or may withhold credit until the deposit is actually paid to us.... We may handle any such deposit in accordance with Federal Reserve requirements.

Shortly thereafter he defaulted on the $74,000 note which was due December 6, 1984.

On December 12, 1984, by prior arrangement, a loan officer of the bank went to the Tolander farm to inventory livestock and machinery. The bank officer estimated the machinery had a value of $58,100.

In December of 1984 the bank told Tolander it wished to restructure his loan. The restructuring would involve dividing the loan into two components, a short-term loan and a long-term loan. Tolander agreed and signed two new notes. Both were covered by security agreements. One was a short-term note for $40,500, due May 1, 1985. A long-term note for $29,000 called for payments in five equal installments, with the first payment due on December 17, 1985. The two promissory notes contained acceleration clauses which stated:

> If any payment due hereunder is not made on time, or if the holder deems itself insecure, the holder may, at its option, declare the entire balance of principal and interest due and payable immediately.

At this time the bank told Tolander that before any additional credit could be extended he would be required to pay off the $40,500 short-term note.

When restructuring the notes Tolander prepared an updated financial statement. In it he listed, as a long-term asset, one and one-half shares of stock in Henrico Park (a sow cooperative). The stock was listed as worth $75,000 even though it was losing money, involved in litigation, and apparently headed for bankruptcy. It soon became apparent to the bank that, even with Tolander's machinery and equipment valued at $58,100, Tolander actually had a negative net worth of $35,255.

On December 31, 1984, Tolander brought to the bank two checks totaling nearly $30,000. The checks were proceeds of grain he had sold. Although the bank had requested that these funds be applied to Tolander's loan, Tolander asked to use part of the money for supplies, living expenses and other obligations. The bank then released $6000 to Tolander and applied the rest to the notes.

In March of 1985 Tolander made payments on the large note, reducing the principal balance to $37,803.21. During this time Tolander approached the bank to seek a 1985 operating loan, but was told the bank could not loan him money because of the bank examiner's report. The bank indicated it would, however, advance funds if the Farmers Home Administration (FmHA) would guarantee the loan. Tolander sought such a guarantee from the FmHA, but negotiations failed when it became apparent that Henrico Park was going into bankruptcy. The bankruptcy of course called into question the value of the one and one-half shares of Henrico stock as listed on Tolander's financial statement. As a result the FmHA refused to guarantee the loan.

In April of 1985 the bank examiners again reported that there was inadequate security for any operating loan to Tolander. At that time as a result of a new inventory of Tolander's machinery the $58,100 value assessed earlier was reduced to $29,000. Based on all these factors Tolander was unable to secure an operating loan for 1985.

In early May 1985 Tolander received two checks from Northrup King Co. in payment of seed corn he had raised. It was made out jointly to Tolander and the bank. He brought the checks to the bank and endorsed them so they could be applied to the large note. Shortly thereafter Tolander received a third check from Northrup King, also made out to him and the bank. He deposited the check without presenting it to the bank for co-endorsement. He then wrote a check to pay off the balance of the large note, leaving the remainder ($2380.77) in his account. It is clear that the bank had a valid security interest in the Northrup King checks and that Tolander was not permitted to use the proceeds for any other purpose than debt reduction.

A fourth Northrup King check, in the amount of $16,992.40, was issued on or about May 20, 1985. It also was made payable to both Tolander and the bank. Tolander had maintained a post office box in Winfield, Iowa. The fourth Northrup King check, for reasons the parties dispute, was not delivered to Tolander. The postmaster delivered it directly to the bank. The bank explains that, sometime in 1985, after a former bank employee had left the bank, a bank officer had somehow made an arrangement with the Winfield postmaster. Mail that was addressed to the former employee and also in whole or in part to the bank would be delivered to the bank. According to the banker the conversation did not involve Tolander's name or any person other than the former bank employee.

The bank deposited the check in Tolander's account. It then withdrew from Tolander's account the $2380.77 balance remaining from the third Northrup King check, along with the $16,992.40 from the fourth check, and applied it to the unpaid balance on the small note, reducing the unpaid balance to $11,493.16. The bank wrote to Tolander on May 28 informing him of what it had done.

On August 21, 1985, Tolander filed the present action seeking unspecified general, special, and punitive damages. On Tolander's appeal from adverse findings and judgment by the district court our review is on error. Iowa R.Civ.P. 4.

■ I. On appeal Tolander contends the bank received the $16,992.40 check as his agent. He cites the rule that "an agent cannot represent both himself and his employer in transactions where their interests are adverse." *Pedersen v. Life of Mid-America Ins.*, 164 N.W.2d 337, 345 (Iowa 1969). A careful review of the district court pleadings reveals no allegation regarding a principal-agent relationship between the parties. The bank contends we should not consider the contention, relying on the rule that a matter not urged in district court will not be reviewed on appeal. *State Farm Mut. Auto. Ins. Co. v. Pflibsen*, 350 N.W.2d 202, 207 (Iowa 1984).

Contending the question was raised in trial court, Tolander can point, not to any pleadings, but only to a tenuous reference in his trial brief. We need not resolve whether statements in Tolander's trial brief amounted to a reference to the agency theory he seeks to pursue on appeal. It

has long been the rule that a district court brief is not a part of the record for purposes of error preservation. *State v. Higginbotham*, 351 N.W.2d 513, 516 (Iowa 1984) ("A matter is not preserved for review on appeal if it is mentioned in district court only in [a] memorandum brief. Such a document is not a part of the record for purposes of error preservation."). Hence we give no consideration to Tolander's agency theory.

■ II. Tolander's second assignment alleges the district court erred when it determined the bank to be insecure and thus within its legal right to accelerate the loan. Of course the central focus of Tolander's complaint is upon the fourth Northrup King check. This was the one which had been made out jointly to the bank and Tolander but addressed only to Tolander. The bank's version would have us believe that the check just happened to show up in the bank's mail. The bank contends this was because, as previously explained, the bank had arranged for delivery of checks made out jointly to the bank and a prior bank employee.

It is easily understandable why Tolander views this explanation of the misdirected check with unbounded skepticism. There is no support in the record for a district court finding that the check was addressed to both Tolander and the bank; it was made out to them jointly but clearly it was addressed only to Tolander. The previous similar Northrup King checks had been delivered as addressed: to Tolander.

Collin Fritz, the Iowa superintendent of banking from 1969 to 1971, testified as a witness for Tolander. He stated that bankers generally find loans insecure if one or more of the following exist: the borrower has a negative cash flow; the borrower is highly leveraged; the borrower has a negative net worth; or the borrower doesn't follow directions of bank officials concerning application of proceeds in which the bank has a security interest. Fritz agreed that it appeared Tolander had a negative cash flow in 1985. Fritz nevertheless stated he was "appalled" by the bank's actions in accepting the check. He testified:

My banking history of some forty years or something, one way or another, I have never observed any activity of this type ... I cannot, for the life of me, figure out why that bank took that check and applied all the funds on a note prior to maturity, and then took additional funds out at the same time. It was—I treat it as a malicious act, irresponsible.

Obviously the trial court subscribed only to a part of Fritz's testimony. Because our review is not de novo, but only on error, we must yield to the district court finding that there was no showing of malice or bad faith. We do not pass on whether this was a responsible banking practice.

Even accepting the bank's version of the event, that the check just happened to appear with the mail one morning, the bank's treatment was at best cavalier. The check was not held; no notice was given Tolander. The bank straightway acted on its feeling of insecurity and accelerated a note which was not otherwise in default. It and the entire balance of his checking account was then applied to the note. This was done even before Tolander was told the check had been misdelivered.

■ III. The circumstances surrounding the fourth check are not determinative. The bank is not necessarily liable for doing crudely whatever it had a right to do legally.

We considered a claim of bad faith by a bank in *Farmers Cooperative Elevator, Inc., Duncombe v. State Bank*, 236 N.W.2d 674 (Iowa 1975), a case cited and relied on by both parties. The question in *Farmers Cooperative* was whether a bank acted in good faith when it set off the elevator's checking account against its notes with the bank. The due dates on the bank notes had not arrived and, therefore, the bank relied on the acceleration and set-off clauses which were contained in the elevator's promissory notes. We held that a bank may set off general deposits against a depositor's mature debts. *Farmers Coop.*, 236 N.W.2d at 677. *See Porter Auto Co. v. First Nat'l Bank*, 185 Iowa 844, 846, 171 N.W. 121, 122 (1919); 5A

Michie, *Banks and Banking* § 115b at 307 (1973). Because the notes were not due we turned to a good-faith analysis, relying on section 554.1208 of the Code for guidance. Because that section has not been materially changed we quote it as it appears in the 1989 Code. It reads:

A term providing that one party or that party's successor in interest may accelerate payment or performance or required collateral or additional collateral "at will" or "when that party deems itself insecure" or in words of similar import shall be construed to mean that that party shall have power to do so only if that party in good faith believes that the prospect of payment or performance is impaired. *The burden of establishing lack of good faith is on the party against whom the power has been exercised.*

(Emphasis added.)

We acknowledged that the bank must act in good faith, but stated "the issue ... is whether the Elevator adduced proof that the bank was *not* in good faith. The Elevator had to introduce substantial evidence of lack of good faith; a mere scintilla would not suffice." *Farmers Coop.*, 236 N.W.2d at 677 (emphasis in original).

The Code defines "good faith" as "honesty in fact in the conduct or transaction concerned." Iowa Code § 554.1201(19). Because the elevator owed the bank $272,-000, was seeking a short-term $50,000 loan, had closed for four business days due to a lack of cash flow, and had a very small amount of company-owned grain on hand, we found substantial evidence that the bank was honest and not acting in bad faith when it accelerated the note.

In the present case the bank likewise must turn to the acceleration clause in the note to justify its seizure of the check. That clause gave the bank authority to act on either of two occurrences: (1) nonpayment of an amount when due; or (2) the bank deeming itself insecure. There were no defaults on payments when due so the bank's justification must rest on insecurity.

The question then becomes whether substantial evidence supports the trial court finding of insecurity. The evidence of Tolander's financial problems is indeed compelling. Although the $29,000 note was not mature there was considerable evidence to support the bank's finding of insecurity. Tolander argues there was adequate security pledged to the bank and, therefore, the bank should not have resorted to offsetting his account. As the bank accurately states in its brief, there is no authority in Iowa requiring the bank to first resort to pledged security. *See Jensen v. State Bank of Allison*, 518 F.2d 1, 6 (8th Cir. 1975); Iowa Code § 554.9501(1).

We conclude that the trial court judgment must be affirmed. Although the bank obviously collects no plaudits it remains that Tolander has not shown that the bank acquired anything to which it was not entitled. Notwithstanding its insensitivity to Tolander the bank was fully justified in considering itself insecure. Thus, under the terms of the financing agreements, the bank was entitled to the check proceeds.

AFFIRMED.